**SHELTER MUTUAL INSURANCE COMPANY, Petitioner/Cross–Respondent**

v.

**MID–CENTURY INSURANCE COMPANY, Respondent/Cross–Petitioner.**

No. 09SC62.

Supreme Court of Colorado, En Banc.

Jan. 18, 2011.

Light, Harrington & Dawes, P.C., Sophia H. Tsai, Denver, Colorado, Attorneys for Petitioner/Cross–Respondent.

Wick & Trautwein, LLC, Robin L. Wick, Kimberly B. Schutt, Fort Collins, Colorado, Attorneys for Respondent/Cross–Petitioner.

John W. Suthers, Attorney General, Todd S. Larson, Senior Assistant Attorney General, Denver, Colorado, Attorneys for Amicus Curiae Colorado Division of Insurance.

Justice MARTINEZ delivered the Opinion of the Court.

## I. Introduction

We granted certiorari to review the court of appeals' decision in *Shelter Mutual Insurance Co. v. Mid–Century Insurance Co.*, 214 P.3d 489 (Colo.App.2008). At issue in this case is how two insurance companies must share losses arising from an automobile accident. The owner of one of the automobiles involved in the accident insured his vehicle through Shelter Mutual Insurance Company ("Shelter"); Shelter is responsible for losses because the vehicle owner permissively lent the vehicle to his son—the driver—who crashed the vehicle. But the driver also had his own insurance policy with Mid–Century Insurance Company ("Mid–Century"), which is responsible for losses because it covered the driver as a non-owner operator of the vehicle.

How the insurers divide responsibility for losses depends on two main issues.[1] The

1. We originally granted certiorari on the follow- ing issues:

first involves whether a "step-down" provision in Shelter's policy that reduces the amount of coverage available for permissive drivers is either unenforceable because the insurer failed to adequately notify the insured of the provision's inclusion in a renewal policy, or, if notice was adequate, whether "step-down" provisions are void as a matter of public policy. The second issue involves whether Shelter's excess clause is valid under Colorado law, and if it is, what effect it has given that Mid–Century's policy also includes an excess clause.

The court of appeals held that Shelter's "step-down" provision is unenforceable because Shelter failed to provide the owner with sufficient notice of the reduction in coverage when the owner renewed his policy. Because of this determination, the court never reached the question of whether "step-down" provisions are void as a matter of public policy.

The court of appeals also held that Shelter's excess clause does not violate Colorado law, and that because both Shelter's and Mid–Century's policies contain excess clauses, both clauses are mutually repugnant and void; accordingly, the two insurers are co-primary for covering the losses.

We agree with the court of appeals and affirm its decision. Shelter failed to clearly and unequivocally call out to the owner's attention the reduction in coverage effected by the "step-down" provision. The general notice of policy changes did not sufficiently negate the owner's reasonable expectation that his renewal policy contained the same terms as his original policy. Hence, Shelter's "step-down" provision is unenforceable for lack of adequate notice, and Shelter is bound by the terms in its original policy.

Because the "step-down" provision is unenforceable for lack of adequate notice, we do not address whether "step-down" provisions are void as a matter of public policy.

Shelter's excess clause does not violate Colorado law; we disagree with the argument that it erodes the statutory mandate that all vehicle owners purchase insurance. Based on the reasoning in *Allstate Insurance Co. v. Avis Rent–A–Car System, Inc.,* 947 P.2d 341 (Colo.1997), which was decided under Colorado's No–Fault Act, we hold that a vehicle owner's insurer need not be the primary insurer where there is more than one applicable insurance coverage. The plain language of Colorado's mandatory-insurance laws does not establish a primary-insurer requirement, and the legislature clearly knew how to establish such a requirement had it desired to do so.

Nor is there any compelling public policy basis for reading a primary-insurer requirement into the statutory scheme. The public policy behind Colorado's mandatory-insurance laws only requires that the public benefit from insurance coverage—not that any insurer be primary. Based on this coverage principle and Colorado's strong policy of freedom of contract, insurers are not prevented from using other-insurance clauses.

We also decline to read into the statutory scheme a primary-insurer requirement arising from industry custom. No industry custom exists that compels the vehicle-owner's insurer be primary, and we instead turn to the language of the insurance policies themselves to determine which insurers are primary.

Because Shelter's and Mid–Century's policies both contain valid excess clauses, they are mutually repugnant and void. Accord-

1. Whether an automobile insurance policy provision limiting coverage for permissive drivers of insured vehicles to the minimum limits of liability insurance required by state law is valid and enforceable under Colorado law.
2. Whether the court of appeals erroneously determined that the notice of a limitation in coverage for permissive drivers in a renewal automobile insurance policy was not adequate to advise the named insured of the limitation.

3. Whether Colorado's compulsory insurance laws allow the insurer of a private vehicle to contractually shift the statutory obligation to provide minimum insurance coverage to a permissive driver's insurer.
4. Whether the operation of petitioner's excess insurance clause and cross-petitioner's excess insurance clause renders neither insurer primarily liable for damages caused by the insured such that each policy's excess insurance clause is unenforceable and each insurer must respond as co-primary.

ingly, both insurers are co-primary, and they must share the losses on a dollar-for-dollar basis until the policy limits of one insurer have been exhausted.

## II. Background

The following facts are undisputed. In September 2004, Mark Brown (the "driver"), permissively borrowed and drove his father's automobile, colliding with another automobile driven by Virginia Johnson; both drivers sustained injuries.

Two insurance companies are now responsible for covering losses caused by this collision. First, at the time of the accident, the driver had automobile liability insurance coverage with Mid–Century, which covered him as a non-owner operator of the vehicle. Second, the owner of the automobile, Bruce Brown (the "owner"), insured the automobile with Shelter, which covered the driver as a permissive driver.

When the owner initially purchased his policy through Shelter, he had elected coverage in the amounts of $50,000 per person or $100,000 per accident for bodily injury, and $50,000 for property damage. This coverage was greater than the minimum coverage amounts required by Colorado law. *See* § 10–4–620, C.R.S. (2010) (requiring liability insurance for $25,000 per person and $50,000 per accident for bodily injury, and $50,000 for property damage).

When the time came for the owner to renew his policy, Shelter sent him a packet of policy-renewal forms, the first page of which was titled "Notice of Automobile Policy Changes." The notice, in its entirety, provided the following:

When you pay this renewal premium, you will be issued our new Automobile Insurance Policy. You should take some time to become familiar with its provisions and the responsibilities you have as a policyholder under this contract.

New definitions have been added to assist in policy coverage interpretation. The policy has been rearranged in some areas for ease of reading.

Some changes will affect coverage you now have and will require decisions on your part. You may want to discuss these items with your agent.

Please note—if the owner listed on the title of the vehicle insured under this policy is not one of the named insureds listed on the declarations page, please contact your agent.

Thank you for selecting Shelter Insurance as your insurance provider.

This notice did not inform the owner of any of the changes that were being made, nor were those changes marked in the policy.

As pertinent here, Shelter made two changes. The first change was that, through a "step-down" provision, Shelter sought to limit its liability for permissive drivers to the minimum coverage amounts mandated by law:

As used in this Part, insured means:

. . .

(5) any individual who has permission or general consent to use the described auto. However, the limits of our liability for individuals who become insureds solely because of this subparagraph, will be the minimum limits of liability insurance coverage specified by the financial responsibility law applicable to the accident, regardless of the limits stated in the Declarations, and only those coverages required by such law will be provided unless a specific coverage specifically states otherwise.

The new policy referenced this change twice. But the renewal notice provided to the owner did not explain that the "step-down" provision would—at least in Colorado—result in coverage amounts for permissive drivers that were less than what the owner had earlier elected. Similarly, the Declarations page for the new policy did not explicitly reference the potentially lower coverage amounts for permissive drivers; rather, it only broadly disclaimed that the limit of Shelter's liability "is stated in the policy."

The second change was that Shelter added an excess clause that sought to shift liability to other, applicable insurances: "If there is other insurance which covers the insured's liability with respect to a claim also covered by this policy, Coverages A and B of this policy will apply only as excess to such other

insurance." In Shelter's policy, Coverage A covers bodily-injury liability, and Coverage B covers property-damage liability.

Shelter's excess clause was similar to the one Mid–Century included in its policy covering the driver: "Any insurance we provide for a vehicle you do not own shall be excess over any other collectible insurance."

Despite the changes Shelter made to the policy, the owner renewed his policy by paying the same premium he paid when he first obtained the policy.

After the accident between the driver and Ms. Johnson, Shelter brought a declaratory judgment action asserting its reduced liability through the "step-down" provision and, because of the conflicting excess clauses in both policies, seeking to compel Mid–Century to contribute on a co-primary basis. In response, Mid–Century argued that Shelter's "step-down" provision was invalid under Colorado law, and even if it were valid, it was unenforceable because Shelter failed to provide sufficient notice of the reduction in coverage to the owner at the time of the policy renewal. In regards to Shelter's excess clause, Mid–Century argued that it was void because it eroded the statutory mandate that all automobile owners carry liability insurance. § 10–4–619, C.R.S. (2010). Alternatively, Mid–Century argued that even if Shelter's excess clause was valid, Shelter should still be the primary insurer for covering the losses.

On cross motions for summary judgment, the trial court held that Shelter's "step-down" provision was valid and enforceable under Colorado law because whether the owner received adequate notice of the change was "inconsequential." The trial court also held that both policies' excess clauses were valid; consequently, under Colorado law, they were mutually repugnant and void.

The court of appeals reversed the trial court's determination on the enforceability of the "step-down" provision, concluding that the provision was unenforceable because Shelter failed to provide the owner with sufficient notice of the reduction in coverage. But the court affirmed the trial court's determination that because both policies contain valid excess clauses, both clauses are mutually repugnant and void, rendering the two insurers co-primary for covering the losses.

## III. Enforceability and Validity of Shelter's "Step–Down" Provision

Shelter contends that the court of appeals erred in concluding that the owner did not receive sufficient notice of the reduction in coverage for permissive drivers. We disagree, concluding that because the owner did not receive adequate notification of the reduction in coverage, Shelter's "step-down" provision is unenforceable. We therefore do not reach the question of whether "step-down" provisions are void as a matter of public policy.

■ Because we are reviewing a grant of summary judgment, we do so under a de novo standard of review. *Rocky Mountain Festivals, Inc. v. Parsons Corp.*, 242 P.3d 1067, 1074–75 (Colo.2010). Summary judgment is only proper where there is no genuine issue of material fact in dispute, entitling the moving party to summary judgment as a matter of law. *Id.*

■ In *Cyprus Amax Minerals Co. v. Lexington Insurance Co.*, we stated the general rule that "[i]nsurers seeking to avoid liability 'must do so in clear and unequivocal language and must call such limiting conditions to the attention of the insured.'" 74 P.3d 294, 307 (Colo.2003) (quoting *Tynan's Nissan, Inc. v. Am. Hardware Mut. Ins. Co.*, 917 P.2d 321, 324 (Colo.App.1995)). In the context of insurance-policy renewals, this rule is especially important, requiring an insurer to provide adequate notice to an insured of any reduction of coverage in the policy. *Tepe v. Rocky Mountain Hosp. & Med. Servs.*, 893 P.2d 1323, 1328 (Colo.App. 1995). If an insurer fails to provide adequate notice, then it is "precluded from relying on the existence of such [a] limitation[ ] to avoid liability." *Id.* As a result, the insurer is "bound by the greater coverage" in the earlier policy. *Gov't Emp. Ins. Co. v. United States*, 400 F.2d 172, 175 (10th Cir.1968) (applying Colorado law); *see also Tepe*, 893 P.2d at 1328.

This renewal-notification requirement exists because of the unique nature of insurance policies, whose purchasers are "not expected to be highly sophisticated in the art of reading insurance policies." *See State Farm Mut. Auto. Ins. Co. v. Nissen*, 851 P.2d 165, 167 (Colo.1993). Although normally a party to a contract can be presumed to know the content of that contract, *see Davis v. M.L.G. Corp.*, 712 P.2d 985, 991 n. 7 (Colo. 1986), this presumption does not apply in the context of insurance-policy renewals. Unless adequately notified otherwise, an insured may rely "on the assumption that the renewal contract provisions remain[ ] unchanged." *Gov't Emp. Ins. Co.*, 400 F.2d at 175. In the absence of adequate notification, it is thought that the "insurer is guilty of fraudulent or inequitable conduct or has committed an error." *Id.* Where insureds have not been adequately notified of a reduction in coverage, they have "an objectively reasonable expectation" that their coverage has not been reduced. *See Tepe*, 893 P.2d at 1330.

In regards to what constitutes adequate notification of any reduction in coverage during the renewal of a policy, it is insufficient for an insurer merely to provide a new policy and instruct "the insured to carefully read" it. *Gov't Emp. Ins. Co.*, 400 F.2d at 175. Instead, in line with the rule in *Cyprus*, an insurer must "clearly" and "unequivocally" call any reductions in coverage to the insured's attention. This means, in part, that insurers must conspicuously and specifically disclose any reductions in coverage.

In *Tepe*, an insured's original health insurance policy covered a treatment that was not covered by subsequent policies, so the insurer claimed that the insured was not entitled to benefits for that treatment. 893 P.2d at 1325. But the court of appeals held that the insured was entitled to that benefit, because she had not received adequate notification of the reduction in coverage. *Id.* at 1329. Although the subsequent policies contained sections titled "How the Plan Changes," which purportedly listed all the changes in the policies, these sections never expressly disclosed that the subsequent policies contained a reduction in coverage for the treatment in question. *Id.* at 1328–29; *see also Sanchez v. Conn. Gen. Life Ins. Co.*, 681 P.2d 974, 977 (Colo.App.1984) (where an insurer fails to provide a receipt containing a provision limiting coverage for life insurance, an issue arises over whether that limitation applies because of an insured's reasonable expectations that it may not).

As we look to the adequacy of the notice in this case, we analyze the "totality of the circumstances involved in the transaction from the point of view of an ordinary layperson." *See Sanchez*, 681 P.2d at 977. Doing so, we come to the conclusion that Shelter's notification of the reduction in coverage was inadequate.

As a preliminary matter, we first classify the "step-down" provision as a "reduction in coverage." The owner's original policy insured permissive drivers at levels greater than the minimum amounts required under Colorado law, while the renewal policy reduced coverage to the amounts required under Colorado law.

We turn now to the notice Shelter provided the owner, which, as pertinent here, stated the following:

When you pay this renewal premium, you will be issued our new Automobile Insurance Policy. You should take some time to become familiar with its provisions and the responsibilities you have as a policyholder under this contract.

New definitions have been added to assist in policy coverage interpretation. The policy has been rearranged in some areas for ease of reading.

Some changes will affect coverage you now have and will require decisions on your part. You may want to discuss these items with your agent.

This notice was inadequate because it did not sufficiently negate the owner's reasonable expectation that his renewal policy was unchanged from his original policy by clearly and unequivocally calling his attention to the "step-down" provision.

The notice did not inform the owner of any of the specific changes in his policy, nor were those changes marked in the policy or stated

in the Declarations page. In this way, Shelter's notice provided a general instruction for the owner to read through his policy, which is insufficient notice under *Government Employees Insurance Co.* Indeed, Shelter's notice is even more deficient than the notice in *Tepe,* which, while incomplete, at least attempted to list the changes in the policy. Hence, if the insured in this case had wanted to discover how his policy had changed, he would have had to have placed his original policy against his renewal policy, and, line by line, tried to ascertain those changes. Considering that the notice stated that the policy had "been rearranged in some areas," this could have been difficult.

But assuming that the insured could have discovered the changes, he would then have had to determine whether those changes constituted reductions in coverage. This, too, would have been difficult. In this case, the "step-down" provision limits coverage for permissive drivers to the minimum coverage amounts required in each state. On appeal, Shelter complains that because these minimum coverage amounts vary from state to state, requiring it to advise its insureds about the potential effect the "step-down" provision would have on their coverages would be an "undue burden." As much of a burden this may be for a sophisticated entity like Shelter, it is far more of a burden for the insured—an ordinary consumer who is not sophisticated in reading insurance policies and who likely has no familiarity with insurance laws.

As a practical matter, we note that the owner would have been highly unlikely to spend the time to compare policies and try to ascertain reductions in his coverages, nor would he have been likely to call his agent about the matter. There would have been little motivation to do so, as Shelter's notice only stated that "some changes will affect coverage"—not that there were actually any reductions in coverage. Moreover, the insured paid the same price for his renewal policy as he had paid for his original one, lending support to the assumption that the renewal policy had not reduced coverage. In sum, the insured had an "objectively reasonable expectation" that his renewal policy provided the same coverage as his original poli-cy, even considering the insured had received Shelter's general notice of changes.

As a result of Shelter failing to provide adequate notice of the reduction in coverage, it is precluded from relying on the existence of the "step-down" provision to reduce its liability. Accordingly, Shelter is bound under the terms of its original policy: $50,000 per person or $100,000 per accident for bodily injury, and $50,000 for property damage. Because the effect of Shelter's failure to adequately notify the insured about the "step-down" provision is as if the provision was never adopted, we, like the court of appeals, do not reach the issue of whether "step-down" provisions are void as a matter of public policy.

## IV. Validity and Application of Competing Excess Clauses

We turn now to the second main issue that determines how the insurers are to divide responsibility for the losses, which is the validity of Shelter's excess clause and, if valid, the effect it has given a competing excess clause in Mid–Century's policy. We affirm the court of appeals' determinations on these issues, concluding that Shelter's excess clause is valid, and that because Shelter's and Mid–Century's policies both contain excess clauses, they are mutually repugnant and void. Hence, the insurers are co-primary for covering the losses.

### A. Validity of Shelter's Excess Clause

As a threshold issue in considering whether Shelter's excess clause is valid and enforceable, we observe that although Shelter added its excess clause to the owner's policy on renewal just like it added its "step-down" provision, we need not analyze whether the excess clause is unenforceable for lack of the owner receiving adequate notification. As discussed above, in order to avoid being bound by their original policies, insurers need only notify named insureds of any "reduction[s] in coverage." *Tepe,* 893 P.2d at 1328.

Here, the excess clause cannot properly be considered a reduction in coverage. Although it may effectively reduce the amount Shelter is liable on the policy, the owner

enjoys the same coverage with or without the excess clause; unlike the situation with the "step-down" provision, the owner is not adversely affected by the addition of the excess clause. In fact, the excess clause may indirectly benefit him: if Shelter is able to shift full or partial responsibility for the losses to another insurer, then this may serve as a mitigating factor if Shelter considers raising the owner's premium for an at-fault accident. *See* Colorado Private Passenger Automobile Insurance Summary Disclosure Form, 3 Colo.Code Regs. 702–5: Appendix (2010) (stating that one factor that may increase an insured's premium is an at-fault accident or traffic conviction).

■ Accordingly, we proceed to Mid–Century's main argument against the validity of Shelter's excess clause. If an insurance "policy provision violates public policy by attempting to 'dilute, condition, or limit statutorily mandated coverage[,]' then it may be void and unenforceable." *DeHerrera v. Sentry Ins. Co.*, 30 P.3d 167, 173 (Colo.2001) (quoting *Terranova v. State Farm Mut. Auto. Ins. Co.*, 800 P.2d 58, 60 (Colo.1990)). Mid–Century argues that Shelter's excess clause is void because it erodes the statutory mandate that all automobile owners carry liability insurance. According to Mid–Century, this statutory mandate requires that the owner's insurance be primary in the event coverage is provided by more than one insurance company. The court of appeals disagreed with Mid–Century, and so do we.

To reach our result, we interpret Colorado's mandatory-insurance laws, and we do so in light of *Allstate*, a case we decided under Colorado's now-sunset No–Fault Act. In *Allstate*, when confronted with two insurance policies containing excess clauses, we declined to designate either insurer as primary because the mandatory-insurance laws did not contain such a requirement and because

public policy only required that vehicle owners purchase insurance coverage—not that the owner's insurer be primary.

Because its rationales are still persuasive, we extend *Allstate*'s holding to Colorado's tort-based system and decline to read any primary-insurer requirement into Colorado's mandatory-insurance laws. We are not persuaded by jurisdictions that have reached an opposite result; the requirement to purchase insurance should not be conflated with the issue of which insurer should be primary, and the public policy behind Colorado's mandatory insurance laws only requires that vehicle owners have coverage in effect. How insurers apportion liability through other-insurance clauses, like excess or escape clauses,[2] does not affect insureds' coverage.

Further, industry custom does not require us to read a primary-insurer requirement into Colorado's mandatory-insurance laws. Instead, in line with many other jurisdictions, we determine which insurer is primary based on the language of the policies themselves. Under the same summary judgment standards discussed above, we conclude that Shelter's excess clause is valid under Colorado law.

Because Shelter's excess clause is valid under Colorado law, and because it conflicts with Mid–Century's excess clause, both clauses are mutually repugnant and void. Hence, both insurers are co-primary for covering the losses until the limits of one policy are reached.

### 1. Colorado's Mandatory-Insurance Laws

■ To assess Mid–Century's argument, we must interpret Colorado's mandatory-insurance laws, which we do under a de novo standard of review. *Moffett v. Life*

---

**2.** There are three main types of other-insurance clauses: "pro rata," "excess," and "escape." *Allstate Ins. Co. v. Frank B. Hall & Co. of Cal.*, 770 P.2d 1342, 1345 (Colo.App.1989). "A 'pro rata' clause is one that reduces the carrier's liability by providing for payment of only a portion of the insured's loss, based upon the relationship between the monetary limits of the policy containing the clause and the limits of other policies that cover the risk." *Id.* "An excess

'other insurance' clause purports to make an otherwise primary policy excess insurance should another primary policy cover the loss in question," 15 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 219:33, at 36 (3d ed. 1999), while an escape clause "declare[s] that the insurer is not liable if there is valid and collectible insurance covering the risk," *Id.* § 219:36, at 42.

*Care Ctrs. of Am.,* 219 P.3d 1068, 1072 (Colo. 2009). Our primary duty when interpreting statutes is to ascertain and effectuate the intent of the General Assembly. *Vigil v. Franklin,* 103 P.3d 322, 327 (Colo.2004). Hence, to ascertain the General Assembly's intent, we start with the plain language of the statute. *In re Marriage of Ikeler,* 161 P.3d 663, 666 (Colo.2007). "We will not judicially legislate by reading a statute to accomplish something the plain language does not suggest, warrant or mandate." *Scoggins v. Unigard Ins. Co.,* 869 P.2d 202, 205 (Colo. 1994). We consider the statutory scheme as a whole to give a consistent, harmonious, and sensible effect to all its parts. *Zab, Inc. v. Berenergy Corp.,* 136 P.3d 252, 255 (Colo. 2006).

■ Colorado law requires that automobile owners carry insurance coverage:

> Coverage Compulsory. (1) Every owner of a motor vehicle who operates the motor vehicle on the public highways of this state or who knowingly permits the operation of the motor vehicle on the public highways of this state shall have in full force and effect a complying policy under the terms of this part 6 covering the said motor vehicle.

§ 10–4–619. A complying policy is one that provides minimum coverage amounts "for bodily injury or death" and "property damage arising out of the use of the motor vehicle." § 10–4–620. If automobile owners do not acquire this coverage, they are subject to the sanctions provided under Colorado's Motor Vehicle Financial Responsibility Act. § 10–4–619(1).

Sections 10–4–619 and –620 were, in altered form, originally part of Colorado's No-Fault Act. *See* Colorado Auto Accident Reparations Act (No–Fault Act), ch. 94, sec. 1 §§ 13–25–1 to –23, 1973 Colo. Sess. Laws 334–45 (formerly codified as amended at §§ 10–4–701 to –726). In 2003, the General Assembly let the No–Fault Act sunset, *see* Ch. 189, sec. 1, § 10–4–726, 2002 Colo. Sess. Laws 649, after which, however, the General Assembly readopted and incorporated specific sections of the No–Fault Act into the current tort-based system, including sections 10–4–619 and –620.

### 2. *Allstate*

Under the No–Fault Act, we decided *Allstate,* 947 P.2d 341, in which, to a significant degree, we already addressed the argument Mid–Century makes today. In *Allstate,* we upheld the validity of two excess clauses, concluding that Colorado law did not require that either the automobile owner's or operator's insurance be primary. *Id.* at 347.

The driver in *Allstate* rented an automobile that he crashed into a bus, and two insurance policies covered the driver for liability arising from the accident: the driver's own insurance policy that covered him as an operator of a non-owned automobile; and the rental-car company, as a self-insurer and owner of the automobile, covered the driver through the rental-car agreement. *Id.* at 343. But both insurance policies had "substantially similar" excess clauses that "sought to compel the other insurer to respond as the primary insurer." *Id.*

Although both insurers claimed that the other insurer should be primary, we held that neither the owner's nor the driver's insurer should be designated as the primary insurer. There were two main reasons for this holding. First, we contrasted the No–Fault Act's equivalent of section 10–4–619 with another statute that required an automobile operator's Personal Injury Protection ("PIP") coverage—a required coverage under the No–Fault Act—to be primary despite the existence of other coverage. *Id.* at 345–46. Giving effect to every word of the statutes and refusing to presume the General Assembly "used distinction in language idly," we observed that neither the compulsory coverage statute nor any other applicable section of the statutory scheme specified whether the owner's or operator's insurance must provide primary coverage. *Id.* at 346.

Second, we found no "compelling public policy basis" for requiring that an owner's automobile insurance be primary, embracing the view that "the question of whether [a] particular insurance is primary or excess 'is not a public matter but merely a concern of the insurance companies which have extended coverage to the risk.'" *Id.* at 346 (quot-

ing *Cosmopolitan Mut. Ins. Co. v. Cont'l Cas. Co.*, 28 N.J. 554, 147 A.2d 529, 534 (1959)). In *Allstate*, what mattered was whether complying coverage was "in effect"—not whose insurer was primary. *See id.* at 345.

### 3. Applying *Allstate* to Colorado's Tort–Based System

Although *Allstate* was decided under the No–Fault Act and involved a rental-car agreement, we find it highly persuasive to resolving the case at bar. Indeed, but for the facts that in *Allstate* one of the applicable insurances was procured through a rental-car agreement, and that *Allstate* was decided under the No–Fault Act instead of today's tort-based system, *Allstate* would control the outcome of this case.

▮▮▮ That *Allstate* was decided in a rental-car context does not detract from its persuasiveness in this case. When we construe the terms of insurance policies, we apply principles of contract interpretation. *Cotter Corp. v. Amer. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 819 (Colo.2004). We applied principles of contract interpretation to the policies in *Allstate*, 947 P.2d at 346, and we apply the same principles here. Further, the same mandatory-insurance laws apply here and in a rental-car context.

For the reasons described below, we now extend *Allstate*'s holding beyond the rental-car context and to Colorado's current tort-based system, declining to read into Colorado's compulsory coverage statute a requirement that the automobile owner's insurance be primary.

The plain language of Colorado's mandatory-insurance laws provides no basis for reading a primary-insurer requirement into the statute, as section 10–4–619 does not specify whose insurer—the owner's or the operator's—should be primary where both cover the accident. No other statute speaks to this issue. *See* §§ 10–4–601 to –643, C.R.S. (2010); §§ 42–7–101 to –609, C.R.S. (2010).

This statutory silence is significant considering that the General Assembly, under the No–Fault Act, expressly specified whose insurance must be primary under certain circumstances. *See, e.g.,* § 10–4–707(4), C.R.S. (2002) (requiring automobile operator's insurance to be primary as to PIP benefits) (repealed 2003); § 10–4–707.5, C.R.S. (2002) (specifying which insurers are primary in an accident occurring in a ridesharing arrangement) (repealed 2003). Based on these statutes that designated primary insurers, had the General Assembly wanted to identify an owner's insurer as primary, it knew how to do so. *See Pueblo Bancorporation v. Lindoe, Inc.*, 63 P.3d 353, 362 (Colo.2003) ("If the General Assembly intended to create a fair market value measure for the price of a dissenter's shares, it knew how to provide it; the phrase has been used many times in a wide variety of other statutes."); *People ex rel. S.G.L.*, 214 P.3d 580, 586 (Colo.App.2009) (declining to read into a statute a provision allowing for no-fault adjudications because the legislature knew how to provide for such procedures).

As the court of appeals recognized, the General Assembly has not only declined to assign primary status to an automobile owner's insurance company, but it has expressly given insurers the freedom to contract for "conditions and exclusions that are not inconsistent with the requirements" of the statutory scheme regulating automobile insurance. § 10–4–623(2), C.R.S. (2010). Excess clauses may properly be categorized as a condition of coverage. *See Royal Ins. Co. v. Rutgers Cas. Ins. Co.*, 271 N.J.Super. 409, 638 A.2d 924, 929 (1994) (stating that insurers are free to include conditions like whether their policies will "be primary to or excess over other collectible insurance"). This statutory license is in line with Colorado's strong commitment to freedom of contract. *See City & Cnty. of Denver v. Dist. Court*, 939 P.2d 1353, 1361 (Colo.1997).

▮▮▮ The plain language of the statutory scheme provides no basis for reading a primary-insurer requirement into the statute, and neither does public policy. Colorado's Motor Vehicle Financial Responsibility Law is focused squarely on ensuring that the public has adequate insurance coverage: "[I]t is the policy of this state to induce and encourage all motorists to provide for their financial responsibility for the protection of others, and to assure the widespread availability to

the insuring public of insurance protection against financial loss caused by negligent financially irresponsible motorists." § 42–7–102(1). An excess clause may shift liability to a different insurer, but the net result for the public is still the same—Colorado drivers are still provided with the same level of coverage. *See also* § 10–4–601(2), C.R.S. (2010) (defining a "complying policy" under Colorado's mandatory-insurance laws as one "that provides" the necessary coverage).

### 4. Jurisdictions Reading Primary–Insurer Requirement into Mandatory–Insurance Laws Not Persuasive

We are aware that some courts have interpreted their states' compulsory coverage statutes as requiring that the automobile owner's insurance be primary, even where those statutes do not so expressly provide. *See, e.g., Bowers v. Alamo Rent–A–Car, Inc.,* 88 Hawai'i 274, 965 P.2d 1274, 1277–81 (1998); *Citizens Ins. Co. of Amer. v. Federated Mut. Ins. Co.,* 448 Mich. 225, 531 N.W.2d 138, 139–41 (1995); *State Farm Mut. Auto. Ins. Co. v. Clarendon Nat'l Ins. Co.,* 604 A.2d 384, 387–90 (Del.1992); *Allstate Ins. Co. v. Fowler,* 480 So.2d 1287, 1289–90 (Fla.1986); *Liberty Mut. Ins. Co. v. Home Ins. Indem. Co.,* 116 N.H. 12, 351 A.2d 891, 895 (1976).

We are not persuaded by the rationale of these cases, however, because it needlessly conflates having insurance coverage with making one insurer primary, and because the underlying public policy concerns in Colorado's mandatory-insurance laws do not call for such a result. Generally, the courts that have read a primary-insurer requirement into their compulsory-coverage statutes contend that allowing an automobile owner's insurer to shift responsibility to another insurer violates a statutory scheme that requires an automobile owner to purchase insurance that covers accidents involving permissive drivers. *See, e.g., Citizens Ins.,* 531 N.W.2d at 139–41 (holding that because the mandatory-insurance laws required vehicle owners to purchase insurance covering use of the vehicle, the owners' insurers must be primary). Some courts articulate the fear—rooted in public policy—that allowing insurers to shift liability to other insurers would create a

"practical exemption" to the statutory mandate that vehicle owners purchase insurance coverage. *Bowers,* 965 P.2d at 1278; *Hertz Corp. v. State Farm Mut. Ins. Co.,* 573 N.W.2d 686, 689 (Minn.1998).

In Colorado, this concern was expressed by our court of appeals in *Finizio v. American Hardware Mutual Insurance Co.,* 967 P.2d 188, 190 (Colo.App.1998). In *Finizio,* a car dealership purchased insurance for its automobiles, but that insurance included an escape clause that provided coverage to the dealership's customers so long as they did not have other available insurance or if their insurance was not enough to satisfy the minimum coverage amounts required by law. *Id.* The court invalidated the escape clause and concluded that allowing "an insurer completely to exclude from liability coverage a certain category of permissive users because some other form of coverage exists is inconsistent with" the No–Fault Act in force at the time. *Id.*

We do not find this line of reasoning persuasive, however, because it conflates an automobile owner's requirement to purchase insurance with the requirement that the automobile owner's insurer always be primary. Looking at Colorado's mandatory-insurance laws from the perspective of the insurer, it may appear that, as a practical consequence of using other-insurance clauses, insurers may often not have to "cover" their insureds. But in *Allstate* we did not read Colorado's mandatory-insurance laws from the perspective of the insurer, but of the insured; we relegated the question of which insurer is primary to a "mere[ ] concern of the insurance companies." *See* 947 P.2d at 346.

Many other jurisdictions have done the same. *See, e.g., N.H. Ind. Co. v. Budget Rent–A–Car Sys., Inc.,* 148 Wash.2d 929, 64 P.3d 1239, 1242 (2003) (holding that the policy behind the mandatory-insurance laws "is not implicated where coverage is a given and the only question is *which* insurance company must assume primary responsibility for coverage" (emphasis in original)); *State Farm Mut. Auto Ins. Co. v. Powers,* 169 Vt. 230, 732 A.2d 730, 734 (1999) (holding that insurance provisions "that merely establish the priority of coverage without compromis-

ing coverage for insureds do not violate" statute requiring every automobile insurance policy to provide uninsured motorist coverage); *State Farm Mut. Auto. Ins. Co. v. United Servs. Auto. Ass'n*, 211 Va. 133, 176 S.E.2d 327, 331 (1970) (holding that an excess clause does not affect coverage and simply allows for determining the distribution of liability).

The rationale advanced in *Finizio* is no more compelling because it dealt with an escape clause instead of an excess clause. Given that the purpose of Colorado's mandatory-insurance laws is to ensure that the public is covered by insurance protection, we can discern no compelling basis for treating excess clauses differently from escape clauses. Excess clauses have been analogized to escape clauses, *Travelers Casualty & Surety Co. v. Century Surety Co.*, 118 Cal.App.4th 1156, 13 Cal.Rptr.3d 526, 529 (2004), and both types of clauses essentially describe different sides of the same coin: through an excess clause an insurer initially accepts liability but then tries to shift it to another insurer, while through an escape clause an insurer initially disclaims liability but then accepts it in the absence of other insurance. As Mid–Century argues, under either clause "the effect is still the same: Shelter is shifting its obligation to provide coverage for permissive users." Looking to the public policy directives we have received from our legislature, we determine that it does not matter whether an insurer shifts responsibility through an excess or an escape clause; so long as the insured remains covered, the statutory and public policy requirements have been satisfied. *Accord N.H. Ind. Co.*, 64 P.3d at 1242 ("We have never condemned super escape clauses; they are not prohibited by statute, nor are they contrary to "public morals," whatever those may be."). Therefore, we disagree with the analysis in *Finizio* to the extent it differs from our own.

We are aware that because our decision today gives insurers greater license to use other-insurance clauses, insurers may increasingly turn to the courts to resolve conflicts between more frequently used and sophisticated other-insurance clauses; this is not desirable for several reasons, the principal one being that other-insurance disputes may frustrate the prompt payment of claims to insureds. *See generally, Schoenecker v. Haines*, 88 Wis.2d 665, 277 N.W.2d 782, 786–87 (1979) (describing how other-insurance disputes are "a waste of policyholders' money and of the court's time, and [are] deleterious to the image of the insurance industry."); *Hindson v. Allstate Ins. Co.*, 694 A.2d 682, 685–86 (1997) (describing how insureds may be harmed by other-insurance disputes).

Legislative action could prevent this, producing "uniformity of result in determining excess and primary coverage," which would allow insurers, courts, and insureds to save time and resources. *See State Farm Mut. Auto. Ins. Co. v. Fireman's Fund Ins. Co.*, 149 Ariz. 179, 717 P.2d 858, 860–61 (1986). But these public policy concerns are not before us; rather, they are properly weighed and considered by the legislature, which has the freedom to regulate the insurance industry. *See In re Estate of DeWitt*, 54 P.3d 849, 857 (Colo.2002).

■ In this case, Shelter's excess clause does not reduce the owner's coverage; if it did, we would have ruled the clause as being unenforceable because Shelter failed to provide the owner sufficient notice of the clause's insertion into his renewal policy. We conclude that, in Colorado, "the legislature has not prohibited an owner who has complied with [the compulsory coverage statute's] obligations to maintain coverage from contracting to assume secondary liability if another party is available to assume primary coverage." *Farmers Tex. Cnty. Mut. v. Hertz Corp.*, 282 Conn. 535, 923 A.2d 673, 681 (2007).

### 5. Industry Custom Does Not Compel a Different Result

■ Although we decline to read a primary-insurer requirement into our mandatory-insurance laws on the basis of public policy, Mid–Century also suggests, however, that a primary-insurer requirement should be read into the mandatory-insurance laws because of a pervasive industry custom requiring that the owner's insurer be primary. Indeed, Mid–Century argues that before Colorado enacted the No–Fault Act, Colorado

followed this industry custom; now that the No–Fault Act has sunset, Colorado has returned to this practice. We are not persuaded.

First, the industry custom in question is not as robust and universally applied as its proponents suggest. Historically, designating the owner's insurance as primary was just one of the many ways to resolve the problem of competing "other insurance" clauses:

> [A] number of different and conflicting methods have at various times been used to determine which policy is primary and hence which should bear the brunt of the loss. Thus, it has been stated that the primary policy is the one: covering the tortfeasor; issued prior in time; insuring the vehicle's owner; whose policy covered the particular loss more specifically; or whose other insurance clause is written in more general terms.

*Carriers Ins. Co. v. Amer. Policyholders' Ins. Co.*, 404 A.2d 216, 219 (Me.1979) (citations omitted); *see also Werley v. United Servs. Auto. Ass'n*, 498 P.2d 112, 117 (Alaska 1972) (describing different approaches to determining which insurer should be primary).

But more importantly, many courts have rejected the "search for the mythical 'primary' insurer." *Carriers*, 404 A.2d at 220. These courts have stated, either directly or indirectly, that no industry custom prevails; instead, the language of the insurance policies should determine which insurer is primary. *See, e.g., N.H. Ind. Co.*, 64 P.3d at 1242–43 (holding that it is the language of the policies that determine which insurer is primary, and not a "rule that an owner of the vehicle involved in an accident must provide primary insurance"); *Aetna Cas. & Sur. Co. v. CNA Ins. Co.*, 221 Conn. 779, 606 A.2d 990, 994 n. 6 (1992) (basing its holding upon the language of the policies and not on any "fictitious" doctrine that insurance coverage follows the vehicle); *Mission Ins. Co. v. U.S. Fire Ins. Co.*, 401 Mass. 492, 517 N.E.2d 463, 466 (1988) (rejecting "a hard and fast rule that in all circumstances and under all policies insurance on the vehicle is primary while insurance of the driver is excess" and instead seeking only to effectuate "the policy language before it"); *Ind. Ins. Co. v. Amer. Underwriters, Inc.*, 261 Ind. 401, 304 N.E.2d 783, 785 (1973) (rejecting the majority rule that, "all else being equal, primary liability falls on the owner's insurer rather than the operator's insurer"), *superseded by statute as stated in Ky. Nat. Ins. Co. v. Empire Fire & Marine Ins. Co.*, 919 N.E.2d 565, 600 (Ind. App.1973).

We find the approach of these courts is more closely aligned with our rationale in *Allstate* and Colorado's strong commitment to freedom of contract. Further, we are not persuaded by Mid–Century's argument that, in the wake of the No–Fault Act's sunset, Colorado has reverted to a time when industry custom required the owner's insurer be primary. No Colorado statute has ever required that the automobile owner's insurance be primary, and no Colorado court has ever held as such.

Granted, in *Travelers Indemnity Co. v. Barnes*, we used language that might suggest that an industry custom existed that required the owner's insurance be primary. 191 Colo. 278, 282, 552 P.2d 300, 303 (1976). But all we did in *Barnes* was to invalidate a regulation that sought to require that a vehicle-operator's insurance provide primary coverage not only for PIP coverage but for all coverages. *Id.* at 283–84, 552 P.2d at 304. *Barnes* did not hold that the statutory scheme required "the automobile owner's coverage to be always primary when two coverages exist." *Allstate*, 947 P.2d at 346 n. 2. Moreover, in *Barnes* we merely stated that the "language" of the policies themselves was "based upon customary industrywide rate making and underwriting procedures"; we never held that such custom could cut through the language of the insurance policies and compel a different result. *See Barnes*, 191 Colo. at 282, 552 P.2d at 303.

Accordingly, we hold that Shelter's excess clause does not erode the statutory mandate that all automobile owner's procure insurance coverage, and is therefore valid under Colorado law.

### B. Application of Competing Excess Clauses

Because Mid–Century's policy contains an excess clause, the validity of which

has never been challenged, and because we have concluded that Shelter's excess clause is valid under Colorado law, we must now determine the effect of applying two competing excess clauses. The court of appeals concluded that allowing both clauses to stand would violate compulsory coverage laws, as it would deprive the insured of any coverage at all. We agree.

We review the interpretation of an insurance policy de novo, employing contract-interpretation principles. *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo.2002). We construe the plain language of the contract to effectuate the intent of the parties, and we resolve ambiguities in favor of the insured. *Nissen*, 851 P.2d at 166–67.

Where there are valid, competing excess clauses, we do not give full effect to both of them, as that would leave the insured with no coverage for liability; this is an absurd result that violates public policy. *Allstate*, 947 P.2d at 346. Instead, we declare that both "clauses are mutually repugnant and, as such, are void." *Empire Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 764 P.2d 1191, 1199 (Colo.1988). This renders both insurers co-primary, meaning that both insurers must apportion the loss on an equal, dollar-for-dollar basis "until the limits of one of the policies is exhausted; the second policy must continue to pay to its limits or until the loss has been fully compensated, whichever occurs first." *Allstate*, 947 P.2d at 344.

Mid–Century argues that instead of following *Allstate*, we should instead embrace the total-policy-insuring-intent test. Under this test, "the insurer whose coverage was effected for the primary purpose of insuring that risk will be liable first for payment, and the insurer whose coverage of the risk was the most incidental to the basic purpose of its insuring intent will be liable last." *Integrity Mut. Ins. Co. v. State Auto. & Cas. Underwriters Ins. Co.*, 307 Minn. 173, 239 N.W.2d 445, 446–47 (1976). In order to determine which insurer should be primarily liable, courts look to:

> which policy was intended to cover the activity out of which the accident arose;

which company specifically described the involved automobile in its policy; which company charged a premium reflecting a greater contemplated exposure; and which company apparently issued a policy designed to cover the particular car and the risks inherent in using that particular car.

*Richardson v. Ludwig*, 495 N.W.2d 869, 874 (Min.App.1993).

We decline to break from established precedent and adopt a test that, in regards to determining which insurer is primary, does not regard as dispositive the language used in the policies themselves. *See id.* at 874–75. Moreover, applying the total-policy-insuring-intent test "would often be a tricky business." *See Westfield Ins. Cos. v. Econ. Fire & Cas. Co.*, 623 N.W.2d 871, 877 (Iowa 2001) (describing why the pro-rata approach is better than the closest-to-the risk test, which is a variant of the total-policy-insuring-intent test).

Here, under the approach announced in *Allstate*, both excess clauses conflict. Mid–Century's excess clause provides that "[a]ny insurance we provide for a vehicle you do not own shall be excess over any other collectible insurance." Shelter's excess clause states that, "[i]f there is other insurance which covers the insured's liability with respect to a claim also covered by this policy, Coverages A and B of this policy will apply only as excess to such other insurance"; Coverage A provides protection against bodily-injury liability, and Coverage B protects against property-damage liability. If we were to give full effect to both clauses, the named insured would be without coverage. Because that result is absurd and contrary to public policy, the clauses are mutually repugnant and void. As a result, both insurers are co-primary and must share the losses equally until the limits of either policy are exhausted.

## V. Conclusion

For the foregoing reasons, we affirm the court of appeals. Shelter's "step-down" provision is unenforceable for lack of adequate notice; we decline to address whether such

provisions are void as a matter of public policy. Both Shelter's and Mid–Century's excess clauses are valid; consequently, they are mutually repugnant and void. Both insurers must therefore share losses equally on a dollar-for-dollar basis until the limits of either policy are exhausted.