2014 CO 75

Gary R. JUSTUS; Kathleen Hopkins; Eugene Halaas, Jr.; and Robert P. Laird, Jr., Petitioners/Cross-Respondents

v.

The STATE of Colorado; Governor John Hickenlooper, in his official capacity; Colorado Public Employees' Retirement Association; Carole Wright, in her official capacity; and Maryann Motza, in her official capacity, Respondents/Cross-Petitioners

Supreme Court Case No. 12SC906

Supreme Court of Colorado.

October 20, 2014

Attorneys for Petitioners/Cross–Respondents: Rosenblatt & Gosch, PLLC, Richard Rosenblatt, Greenwood Village, Colorado, Feinstein Doyle Payne & Kravec, LLC, William T. Payne, Stephen M. Pincus, Pittsburgh, Pennsylvania.

Attorneys for The State of Colorado and Governor John Hickenlooper, in his official capacity: John W. Suthers, Attorney General, Daniel D. Domenico, Solicitor General, Bernard A. Buescher, Deputy Attorney General, William V. Allen, Senior Assistant Attorney General, Megan Paris Rundlet, Assistant Attorney General, Denver, Colorado.

Attorneys for Respondents/Cross–Petitioners Colorado Public Employees' Retirement Association; Carole Wright, in her official capacity; and Maryann Motza, in her official capacity: Reilly Pozner LLP, Sean Connelly, Daniel M. Reilly, Eric Fisher, Caleb Durling, Denver, Colorado.

JUSTICE HOBBS delivered the Opinion of the Court.

¶ 1 In 2010, the Colorado General Assembly adopted amendments to existing statutes governing the Colorado Public Employees' Retirement Association ("PERA") pension program. To address economic conditions and projections demonstrating a severely underfunded plan, the legislature approved measures designed to protect present and future retirees by providing for an adequately funded plan. The stated goal of Senate Bill 10–001 was to make "modifications to [PERA] necessary to reach a one hundred percent funded ratio within the next thirty years." Ch. 2, sec. 4, 2010 Colo. Sess. Laws 4. One of the measures included in the act changed the formula for the annual cost of living adjustment ("COLA") that applies to increase each retiree's vested base retirement benefit. Challenged in this appeal, sections 19 and 20 of SB 10–001 reduced the COLA from an annual increase of 3.5%, a fixed percentage that the legislature had approved in its 2000 session, and replaced it with a different COLA formula that capped the annual increase at 2% of the retiree's base retirement benefit. Ch. 186, sec. 7, § 24–51–1002, 2000 Colo. Sess. Laws 782; ch. 2, sec. 20, § 24–51–1002, 2010 Colo. Sess. Laws 20–21.[1]

---

1. We granted certiorari on the following issues in this case:

Issue on Petition for Certiorari:
1. Whether the contract clause framework articulated in *In re Estate of DeWitt*, 54 P.3d 849 (Colo.2002), applies to all contract clause claims under the Colorado constitution.

Issues on Cross–Petition for Certiorari:
2. Whether Colorado Public Employees' Retirement Association ("PERA") members have contractual rights to the cost of living adjustment ("COLA") formulas in place at their respective retirements for life without change.
3. Whether SB 10–001, which adjusted COLAs to their current level of 2% compounded annually, was constitutional because it (a) did not substantially impair contractual expectations and was reasonable and necessary to ensure the pension funds' long-term viability, and (b) was not a regulatory taking.

¶2 The plaintiffs in this case are retired public employees (collectively referred to as "Justus")[2] who contend they have a contract with the State of Colorado ("State") entitling each of them, upon retirement, to have their base pension benefit annually adjusted by the specific COLA formula in existence at the time they were eligible to retire, for the rest of their lives without change. On summary judgment, the district court ruled they had no such contract right to an unchangeable COLA formula. The court of appeals disagreed. It determined that the retirees have a contract right to the formula in place at the time of eligibility for retirement or actual retirement based on the so-called "public policy exception" and remanded for further review to determine whether or not SB 10–001 violated the Contract Clauses of the United States and Colorado Constitutions. *See* U.S. Const. art. I, § 10, cl. 1; Colo. Const. art. II, § 11.

¶3 The district court ruled that there is no contractual right to the COLA formula:

The Court's determination, which deals only with COLA and not with base retirement benefits, relies heavily on the plain language of the PERA and Denver Public School Retirement System ("DPSRS") COLA provisions which have *never* included durational language stating or suggesting that a particular COLA provision formula (and there have been many) was for life without change. For four decades the COLA formulas as applied to retirees have repeatedly changed and have never been frozen at the date of retirement.

Order on Plaintiffs' Motion for Partial Summary Judgment at 3, *Justus v. State*, Case No. 2010CV1589 (Denv. Dist. Ct. June 20, 2011).

¶4 The court of appeals disagreed with the District Court and ruled that the retirees do have a contractual right to the COLA formula:

On appeal, plaintiffs contend that, under the holdings of *Police Pension & Relief Bd. v. McPhail*, 139 Colo. 330, 338 P.2d 694 (1959), and *Police Pension & Relief Bd. v. Bills*, 148 Colo. 383, 366 P.2d 581 (1961), they have a contractual right to the COLA in effect when they became eligible to retire or retired, which could not be reduced. We agree with plaintiffs, subject to certain limitations explained below. Specifically, we conclude that plaintiffs have a contractual right, but that the court must still determine whether any impairment of the right is substantial and, if so, whether the reduction was reasonable and necessary to serve a significant and legitimate public purpose.

*Justus v. State*, 2012 COA 169, ¶3, 337 P.3d 1219 (Colo.App.2012).

¶5 We disagree with the court of appeals and agree with the district court. We hold that the PERA legislation providing for cost of living adjustments does not establish any contract between PERA and its members entitling them to perpetual receipt of the specific COLA formula in place on the date each became eligible for retirement or on the date each actually retires.[3] Accordingly, we reverse the judgment of the court of appeals and uphold the trial court's summary judgment order dismissing this case.

## I.

¶6 The Colorado General Assembly created PERA in 1931 to provide retirement and other benefits to public employees. Ch. 157, §§ 111–1–1 et seq., 1931 Colo. Sess. Laws 742–52. Today, PERA serves more than 440,000 public employees from over 400 government agencies and public entities, providing these members with a retirement pro-

**2.** Gary J. Justus retired from the Denver Public School System in 2003; Kathleen Hopkins retired from state employment in 2001; Eugene Halaas, a former judge, retired in 1999; and Robert P. Laird, Jr. became eligible to retire with full benefits in 2007 and retired in 2010.

**3.** Justus specifically argues that the contractual right to an unchangeable COLA first arose with the 1994 amendment when the legislature

amended the provision making COLA increases "automatic" rather than dependent on the legislature's approval each year, and that the 2001 amendment guaranteed said "automatic" increase by 3.5% each year. This argument is inherently contradictory as the 2001 amendment would be considered an impermissible alteration if the court were to find that the legislature established a COLA formula contract in 1994.

gram as a substitute for Social Security. It is composed of five divisions: state, school, local government, judicial, and, since 2010, Denver Public Schools.[4] § 24–51–201(2), C.R.S. (2014).

¶ 7 PERA is pre-funded by working members and their employers, whose contributions are fixed by statute. *See* § 251–51–401(1.7), C.R.S. (2014) (first added in ch. 175, sec. 1, § 24–51–401(1.7), 1992 Colo. Sess. Laws 1133). When a member retires, the member's monthly base benefit is calculated using a formula that takes account of the member's age at retirement, the number of years of service credit (through employment with a public entity that participates in PERA in combination with any years of purchased service credit), and the member's highest average salary over his or her years of public employment. *See* § 251–51–602, C.R.S. (2014); § 251–51–603, C.R.S. (2014) (first added in ch. 194, sec. 1, § 24–51–603, 1987 Colo. Sess. Laws 1060). PERA members' monthly base benefits may be increased annually by a statutorily created COLA. The annual percentages used to calculate the COLA are also fixed by statute. § 24–51–1002, C.R.S. (2014).

¶ 8 The COLA formulas have been amended numerous times[5] since the General Assembly first enacted provisions authorizing a base COLA and a supplemental COLA in 1969.[6] From 1970 to 1973, the base COLA was the lesser of 1.5% noncompounded or the Consumer Price Index ("CPI") in the prior year. Ch. 256, sec. 1, § 111–1–37, 1969 Colo.

Sess. Laws 904 (state division); ch. 257, secs. 5–6, §§ 111–2–10–11, 1969 Colo. Sess. Laws 908 (local government and school divisions). From 1975 to 1978, supplemental COLA "catch up" payments were appropriated from the General Fund and paid in addition to the base COLA formula. Ch. 222, sec. 1, § 24–51–136, 1975 Colo. Sess. Laws 839–40 (state division); ch. 222, sec. 3, § 24–51–224, 1975 Colo. Sess. Laws 841–42 (local government and school divisions).

¶ 9 Every two years, from 1980 to 1992, the legislature approved a supplement to the base COLA, paid from PERA pension funds to match past inflation. Ch. 118, sec. 3, § 24–51–136, 1980 Colo. Sess. Laws 604. For 1993, the base COLA was changed to the lesser of 4% noncompounded or the CPI increase. Ch. 175, sec. 7, § 24–51–1002, 1992 Colo. Sess. Laws 1136. From 1994 to 2000, the base COLA was capped at the lesser of 3.5% compounded or the CPI increase.[7] Ch. 138, sec. 7, § 24–51–1002, 1993 Colo. Sess. Laws 478–79. From 2001 to 2009, the base COLA was capped at 3.5% compounded annually. Ch. 186, sec. 7, § 24–51–1002, 2000 Colo. Sess. Laws 782.

¶ 10 In 2009, concerned about PERA's severe underfunding, the General Assembly directed the PERA board to submit specific, comprehensive recommendations regarding possible methods to respond to the decrease in the value of PERA's assets to ensure that PERA will become and remain fully funded. Ch. 288, sec. 10, § 24–51–211(2), 2009 Colo.

---

4. In 2010, the General Assembly merged the Denver Public Schools Retirement System into PERA. Ch. 288, secs. 1 to 56, §§ 24–51–101 to –1715, 2009 Colo. Sess. Laws 1331–69.

5. Both the district court and the court of appeals thoroughly summarized the historical legislative changes to PERA's COLA formulas. See Order on Defendants' Motion for Summary Judgment at 5–6, *Justus v. State*, Case No. 2010CV1589 (Denv. Dist. Ct. June 29, 2011); *Justus v. State*, 2012 COA 169, ¶¶ 8–22, 337 P.3d 1219 (Colo. App.2012). For the purposes of brevity and illustration, we discuss only the most significant periodic changes to PERA's COLA formulas.

6. The 1969 *base COLA* specified the percentage increase then-current PERA retirees were entitled to receive in their monthly retirement benefits based on the year each had retired. Ch. 256,

sec. 1, § 111–1–35, 1969 Colo. Sess. Laws 904; ch. 260, sec. 1, § 111–2–21, 1969 Colo. Sess. Laws 917. The 1969 *supplemental COLA* increased retired member benefits each year, on a noncompounded basis, by the lesser of 1.5% or the increase in the Consumer Price Index ("CPI"). Ch. 111, § 111–1–35(2)(b), (3)(c), (5)(b), (6)(c), 1969 Colo. Sess. Laws 897; ch. 257, sec. 8, § 111–2–23, 1969 Colo. Sess. Laws 909–10.

7. At the same time, to reduce the cost of COLA and increase the actuarial soundness of the PERA pension plan, the General Assembly capped the total COLA payments to retirees, eliminated the Cost of Living Stabilization fund paid from PERA pension funds, and ended the biannual increase that had provided catch up to actual inflation since 1980. §§ 24–51–1005, –1006 C.R.S. (1994) (repealed 1994).

Sess. Laws 1337. In response to the board's recommendations, the Colorado General Assembly passed SB 10–001, which, among other measures, modified employee/ employer contributions, put a cap on COLA percentages for retirees, created new contributions for working retirees, and increased the age and service requirements for certain groups of employees before they become eligible to receive retirement benefits. Ch. 2, secs. 1–36, 2010 Colo. Sess. Laws 4–32; SB 10–001, 67th Gen. Assemb., 2d Sess. (Colo. 2010). The stated goal of SB 10–001 was to make "modifications to [PERA] necessary to reach a one hundred percent funded ratio within the next thirty years." *Id.*

¶ 11 A portion of SB 10–001, now codified at section 24–51–1002, sets forth separate formulas for calculating the 2010 and post–2010 COLAs. For 2010, the COLA was calculated according to a variable rate tied to inflation, at the lesser of 2% compounded annually or the CPI increase, which resulted in no COLA for 2010. Ch. 2, sec. 20, § 24–51–1002, 2010 Colo. Sess. Laws 20–21. For 2011 and beyond, the COLA is calculated at 2% compounded annually, unless PERA has a negative investment return for the prior year,[8] in which case it is the lesser of 2% compounded or the CPI increase for the next three years. *Id.* Automatic annual 0.25% COLA increases without limit will occur when PERA's funding ratio reaches 103% and remains above 90%. Ch. 2, sec. 23, § 24–51–1009.5, 2010 Colo. Sess. Laws 22.[9]

¶ 12 As a recipient of retirement benefits through PERA, Justus alleged in the Denver District Court that sections 19 and 20 of SB 10–001 unconstitutionally alter the monthly payments retirees are contractually entitled to receive, in violation of the contract clause of the Colorado constitution and the Contract, Takings, and Substantive Due Process Clauses of the U.S. Constitution. Justus contended that each retiree has a contractual right to the specific COLA in place at the date of his eligibility for retirement, for life without change.[10] Both sides moved for summary judgment. The State reasoned that, although retirees inarguably have a contractual right to their base monthly benefits, they do not have a contractual right to the specific COLA formula in place at the time of retirement.

¶ 13 The district court found that retirees had no reasonable expectation of receiving the benefit of a particular COLA for life, given the number of times the legislature has amended the COLA formulas. In doing so, it observed that none of the legislature's varied COLA formulas have ever contained durational language. The district court further concluded that the existence of a claimed contractual right for purposes of a contract clause claim requires a clear indication that the legislature intended such a contractual right, and the Colorado legislature never bound itself to calculating retirement benefits based upon an unchangeable COLA. Finding no such enforceable contract, the district court dismissed the Contract, Takings, and Substantive Due Process Clause claims.

---

**8.** A negative investment year is a year in which PERA investments have a rate of return that is less than 0%.

**9.** In addition to COLA formula changes, the General Assembly has also altered the effective date of the COLA calculation. For a summary of effective date changes, see Order on Defendants' Motion for Summary Judgment at 7, *Justus v. State of Colorado*, Case No. 2010CV1589 (Denv. Dist. Ct. June 29, 2011).

**10.** The record before us includes transcripts of Senate and House committee hearings on SB 10–001. While individual retirees appeared in support of the bill and its purpose to place PERA on a sound financial footing, others described the significant impact of any reduction to the 3.5% COLA formula the General Assembly had approved in its 2010 session, see ch. 2, sec. 20, § 24–51–1002, 2010 Colo. Sess. Laws 20–21:

> I went back and I took a look at the cost of living inflation over the last 30 years. And it has been 3.79 %, a bit above the 3.5 % COLA that exists in the current law.... So when you consider that it's likely that inflation is going to continue on as it has in the past and when you consider the cost increases that that's going to bring such as for health insurance, I do think a large number of seniors, not this year, not next year, but 5, 10, 15 years down the road are really gonna struggle to make ends meet.

Senate Finance Committee Hearing on SB 10–001, 2010 Leg., 67th Sess. 108–09 (Colo. 2010) (statement of David Wemet).

¶ 14 The court of appeals disagreed with the district court. It held that our decisions in *McPhail* and *Bills* are dispositive of the argument that retirees have a contractual right to a particular COLA. It reasoned that there is "no meaningful distinction between the escalation provision at issue in *McPhail* and *Bills* and a COLA provision: both increase plan members' pension benefits after they have retired, pursuant to a specified formula." *Justus v. State*, 2012 COA 169, ¶ 35, 337 P.3d 1219 (Colo.App.2012). The court of appeals remanded this case to the district court to apply the three-part contract clause analysis enunciated by *In re Estate of DeWitt*, 54 P.3d 849, 858 (Colo.2002).

¶ 15 We undertook certiorari review to address whether retirees have a contractual right to a particular COLA formula for life, without change, when they become eligible for retirement or retire, and if so, whether SB 10–001 unconstitutionally impairs their contractual expectations. We reverse the judgment of the court of appeals and uphold the district court's summary judgment order dismissing the case.

## II.

¶ 16 We hold that the PERA legislation did not establish any contract between PERA and its members entitling them to the specific COLA formula in place on the date each became eligible for retirement or retires. In so holding, we clarify that our previous holdings in *McPhail* and *Bills* are not dispositive in deciding this case.

### A. Standard of Review

¶ 17 Statutory interpretation is a question of law subject to de novo review. *See MDC Holdings, Inc. v. Town of Parker*, 223 P.3d 710, 717 (Colo.2010). We also review the constitutionality of statutes de novo. *Hinojos–Mendoza v. People*, 169 P.3d 662, 668 (Colo.2007). We begin with the presumption that a statute is constitutional; we uphold the statute unless it is proved to be unconstitutional beyond a reasonable doubt. *E–470 Pub. Highway Auth. v. Revenig*, 91 P.3d 1038, 1041 (Colo.2004). We review grants of summary judgment de novo. *Shel-ter Mut. Ins. Co. v. Mid–Century Ins. Co.*, 246 P.3d 651, 657 (Colo.2011).

### B. Contract Clause Jurisprudence

¶ 18 The Contract Clauses of the U.S. and Colorado Constitutions are virtually identical and prevent legislatures from passing laws that impair contractual obligations. *See* U.S. Const. art. I, § 10, cl. 1 ("No state shall . . . pass any . . . law impairing the obligation of contracts. . . ."); Colo. Const. art. II, § 11 ("No . . . law impairing the obligation of contracts . . . shall be passed by the general assembly.").

¶ 19 In the 1970s and 1980s, the U.S. Supreme Court articulated the contract clause balancing test that we, and courts across the nation, have since adopted. *See U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977); *Allied Structural Steel v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978); *Energy Reserves Grp. v. Kan. Power & Light Co.*, 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). Contract clause analysis involves three inquiries: (1) does a contractual relationship exist; (2) does the change in the law impair that contractual relationship; and if so, (3) is the impairment substantial? *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992); *see also DeWitt*, 54 P.3d at 858 (adopting the *Gen. Motors* test). If each of these three component questions is answered affirmatively, the court must then determine whether the impairment is nonetheless justified as "reasonable and necessary to serve an important public purpose." *U.S. Trust Co. of N.Y.*, 431 U.S. at 25, 97 S.Ct. 1505. Thus, while designed to protect vested contract rights from legislative invasion, the U.S. and Colorado Contract Clauses are "not to be interpreted as absolute." *DeWitt*, 54 P.3d at 858.

¶ 20 A plaintiff bringing a contract clause claim must first prove the existence of a contractual relationship establishing a vested contract right. In the first part of the inquiry, where a court finds no contract, there is no need to complete the following two steps of the *General Motors* or *DeWitt*, analysis. *See id.* When analyzing whether the government contracted by statute, it is

presumed that the legislature did not intend to bind itself contractually and that the legislation was not intended to create a contractual right unless there is a clear indication of the legislature's intent to be bound. *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465–66, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985).

> This well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state. Policies, unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of the legislative body.

*Id.* at 466, 105 S.Ct. 1441 (citations omitted). The party asserting the existence of a contract right must overcome this presumption, and courts should proceed cautiously in analyzing the existence and extent of any contractual obligations. *See id.*

■■■■ ¶ 21 State statutory enactments do not of their own force create a contract relationship with those whom the statute benefits because the potential constraint on subsequent legislatures is significant. *Parella v. Ret. Bd. of the R.I. Emps' Ret. Sys.*, 173 F.3d 46, 60 (1st Cir.1999). To determine whether the legislature intended to bind itself contractually, we examine both the language of the statute itself and the circumstances surrounding its enactment or amendment. *U.S. Trust Co. of N.Y.*, 431 U.S. at 17 n. 14, 97 S.Ct. 1505; *Colo. Springs Fire Fighters Ass'n, Local 5 v. City of Colo. Springs*, 784 P.2d 766, 773 (Colo. 1989). If the language of the statute itself contains "words of contract," the legislature may have intended to create an enforceable contract right. *Colo. Springs Fire Fighters Ass'n, Local 5*, 784 P.2d at 773; *see also Parker v. Wakelin*, 123 F.3d 1, 7–9 (1st Cir. 1997) (holding that the Maine statute had not unmistakably given current workers a contractual right to avoid any increased contributions or any other future changes to their pensions).

## C. Application to This Case

■■■ ¶ 22 Contrary to Justus's argument, the contract clause balancing test applies to his claim. It has been applied in the vast majority of other state pension cases raising challenges under the contract clause. *See, e.g., Retired Adjunct Professors of the State v. Almond*, 690 A.2d 1342, 1345 n. 2 (R.I. 1997); *Wis. Prof'l Police Ass'n v. Lightbourn*, 243 Wis.2d 512, 627 N.W.2d 807, 848 (2001); *N.J. Educ. Ass'n v. State*, 412 N.J.Super. 192, 989 A.2d 282, 290 n. 9 (App. Div.2010).

¶ 23 Colorado first applied the modern balancing test in *DeWitt* well after our decisions in *McPhail* and *Bills*. Contrary to the court of appeals' decision in this case, we conclude that those decisions are not dispositive in favor of Justus. In *McPhail* and *Bills* we did not address the criteria for analyzing and determining whether the legislature intended to create a contractual relationship or vested right. Instead, we simply assumed the existence of a vested right and determined that it had been impaired. In doing so, however, we did observe that the operative Denver Charter provision creating the vested right contained explicit words of entitlement:

> In the event that salaries in the Denver Police Department shall be raised after the effective date of this amendment and those members of said department who shall have previously been retired from active service and who are receiving a pension *shall be entitled* to an increase in the amount of their pension equal to one-half of the raise in pay granted in the rank said member held at the time he was retired.

*McPhail*, 338 P.2d at 696 (emphasis added); *see also Bills*, 366 P.2d at 582–83. Here, in comparison, the statutes at issue do not use the word "entitled," nor do they include any similar words creating an unmistakable vested contractual right.

¶ 24 By its very nature a statutory cost of living adjustment is a periodic exercise of legislative discretion that takes account of changing economic conditions in the state and/or nation. Moreover, neither *McPhail* nor *Bills* addressed COLA formulas that have been subject to various changes prior to, and during, retirees' careers. Indeed, the

pension benefit structure in *McPhail* and *Bills* had not materially changed in 35 years. *See McPhail*, 338 P.2d at 695 (discussing the 1956 amendment that "repealed a provision which had been in force since 1919"). In these earlier cases, most retirees were hired and worked their entire 25–year careers under the same pension structure that unexpectedly changed, for the first time, after they had fulfilled their service requirements for retirement. By contrast, here, as the district court found, the COLA formula paid to retirees changed repeatedly during the employment of each named retiree, and, in fact, during the retirement of all pre–2001 retirees.

¶ 25 Under the facts of *McPhail* and *Bills*, voters had approved two increases in the salaries of current police officers at the same time they eliminated the provision that tied retiree benefits to current employer pay. *See McPhail*, 338 P.2d at 695; *Bills*, 366 P.2d at 582. Thus, the pension benefit at issue in *McPhail* and *Bills* substantially differs from the benefit at issue before us: the escalator clause in those cases tied a retiree's entire benefit to the salary of current employees in such a way that eliminating the escalator clause fundamentally changed the entire pension benefit structure. We see a clear and critical distinction between an adjustment made in reflection of cost of living and a set percentage increase tracking raises in pay granted to the rank an employee retired at during his or her retirement. Unlike a COLA, a link to rank pay does not fluctuate outside of a state employer's control.

¶ 26 Indeed, the act at issue in *McPhail* was fundamentally distinct from the COLA change in SB 10–001. Plaintiffs in *McPhail* complained of the complete termination of tying retiree benefits to current salaries, ensuring that retiree benefits could never increase. In contrast, SB 10–001 retained the COLA benefit at a modified level with potential for complete restoration and ultimately a future increase in the COLA. Under SB 10–001 the central mechanism for pension benefits has not changed—it remains a base PERA retirement plan plus a separately calculated cost of living adjustment (base COLA and supplemental COLA) that has repeatedly changed during and after retirement. The General Assembly has changed only the COLA formula that provides a supplement to the retirees' base benefit calculated at retirement, as it has done numerous times before. By its very name, adjustments to the formula necessarily imply fluctuation with changes in the cost of living and CPI.

¶ 27 Justus misinterprets *McPhail* and *Bills* in arguing that they carve out a so-called "public policy exception" when it comes to pension legislation and in arguing that they mandate a unique test with respect to questions of retirement benefits that should be applied instead of the three-part contract clause test. In *McPhail* and *Bills*, the court's sole inquiry in addressing the contract clause claim was whether the police officers possessed a vested right in the escalator provision. As these Colorado cases were decided 40 years prior to *DeWitt*, before the articulation of the modern contract clause test, we only addressed there what is now step one of the applicable contract clause analysis. Although *DeWitt* does not discuss *McPhail* or *Bills*, it clearly departed from the analytical approach used in these earlier cases when identifying the framework for adjudicating contract clause claims rooted in both the U.S. and Colorado Constitutions.

¶ 28 Applying the modern contract clause test, we overrule any implication in *McPhail* and *Bills* that pension legislation is not subject to the presumption that the legislature does not intend to bind itself contractually and does not intend to create a contractual right unless the legislature provides a clear indication of its intent to be bound. Neither *McPhail* nor *Bills* examined the decisive question of whether the legislature intended to contract. Thus, the extent to which *McPhail* and Bills are applicable to modern contract clause inquiries is limited. Rather than following these distinguished and pre-*DeWitt* cases, we apply the proper three-part inquiry that accords no room for a public policy exception. Proceeding with the first prong of the analysis, "whether there is a contractual relationship," which asks a party to "demonstrate that the contract gave him a vested right," *DeWitt*, 54 P.3d at 858,

we conclude that there is no contract right to the COLA.

¶ 29 We are mindful of the disappointment that Justus feels by virtue of the change to the COLA. But he simply has not established that the legislature intended a clear and unmistakable right to an unchangeable COLA formula fixed at the date a public employee becomes eligible for retirement or retires. Upon examining SB 10–001 codified in sections 24–51–1001 and –1002, and prior statutes altering the COLA formula periodically, we observe no contractual or durational language stating or suggesting a clear legislative intent to bind itself, in perpetuity, to paying PERA members a specific COLA formula. We are not at liberty to add or subtract words from a statute, *Colo. Dep't of Revenue v. Hibbs*, 122 P.3d 999, 1004 (Colo. 2005); *Colo. Dep't of Labor & Emp't v. Esser*, 30 P.3d 189, 196 (Colo.2001); we must construe the statutory language as the legislature enacted, or amended, the statute. We must assume that the legislature does not use words idly. *Carlson v. Ferris*, 85 P.3d 504, 509 (Colo.2003).

¶ 30 We afford significance to the legislature's use of durational language in the description of the pension benefit owed to retirees, in contrast to the fluctuating COLA formula which is evidenced by the legislative history. Section 24–51–1001(1) provides that, for certain benefit recipients, "annual increases in retirement benefits ... *shall be* effective with the July benefit ... [and] *shall be* calculated in accordance with the provisions of sections 24–51–1002 and 24–51–1003 and *shall be* paid from the retirement benefits reserve or the survivor benefits reserve" (emphasis added). Section 24–51–1002(2) provides that, for certain benefit recipients beginning in the year 2011, "the increase applied to benefits paid *shall be* the lesser of two percent or the average of the annual increases determined for each month ... in the national consumer price index" (emphasis added).

¶ 31 Justus urges us to construe the legislature's use of the word "shall" as evidence of its intent to bind itself to an unchangeable COLA formula fixed for a retiree without change, once his or her right to PERA benefits has vested.[11] We reject this argument based on a contextual analysis of how the General Assembly used the term. Although sections 24–51–1001(1) and –1002(2) use the word "shall," that mandatory language is directed at the PERA administrator, not the legislature. The plain language of sections 24–51–1001(1) and –1002(2) reveals that the legislature intended to bind the PERA administrator to providing COLA benefits according to the parameters laid out by the legislature in the PERA statutes. We cannot discern from the language of sections 24–51–1001 and –1002 a legislative intent to bind itself or future legislatures to a particular COLA formula.

¶ 32 This distinction comes into sharper contrast when one examines the portions of the PERA statute that do create firm, durational, contractual obligations on the part of the legislature. Section 24–51–101(51), C.R.S. (2014), defines the term "vested benefit" as "an entitlement to a *future* monthly benefit" (emphasis added). This monthly retirement benefit is "payable for the life of the retiree." Ch. 194, Part 8, § 24–51–801(1), 1987 Colo. Sess. Laws 1065–66. The legislature's use of language like "future" and "payable for the life of the retiree" clearly evidences an intent to be bound to pay PERA members their vested base benefit for life. However, there is an absence of such durational language in the statutes governing the COLA formulations. In further examining intent, we accept the district court's finding that the legislature did not create a contract right to a COLA in the 1994 COLA amendment because the 1993 legislative history indicated that no member of the General Assembly expressed intent to create an unchangeable COLA from that

---

11. Justus also presses us to accord deference to Attorney General Opinion 04–04, in particular the words of that opinion that state "the members fully vested pension right cannot be reduced by the General Assembly." First, that opinion is not binding on us. *See Colo. Common Cause v.* *Meyer*, 758 P.2d 153, 159 (Colo.1988) (stating that we afford Attorney General opinions "respectful consideration"). Moreover, Opinion 04–04 did not address and answer the question of whether retirees possess a right to a specific COLA for life without change.

date forward. *See* House Finance Committee Hearing on SB 93–1324, 1993 Legis., at 5:6–10 (Colo. Mar. 24, 1993).

¶ 33 COLAs were first added to PERA's statutory scheme in 1969; the legislature has amended the COLA formula approximately a dozen times since. *See* ch. 253, sec. 6, § 111–1–35, 1969 Colo. Sess. Laws 896–97; ch. 256, sec. 1, § 111–1–35, 1969 Colo. Sess. Laws 904. For 40 years, the COLA formulas applicable to retirees have repeatedly changed and have never been frozen at the date of retirement. Modifications over the past half century reflect the legislature's unbridled management of the COLA and, when viable, provision of an additional cost of living benefit to retirees while maintaining the financial soundness of the PERA program.

¶ 34 From 1994 to 2000, the COLA for retirees was based on a formula that resulted in COLAs ranging from 1.34% to 2.9% per year. In 2001 the COLA was raised to a flat 3.5%, but then it was reduced to 2% in 2009. Given that plaintiff retirees purport to represent all persons who retired between 1994 and 2010, it is inconceivable that there are not retirees among the as-yet-uncertified class who worked for a substantial part of their careers with no expectation of a COLA at all, yet retired after 1994 when the first COLA was adopted. Likewise, individuals who retired in Colorado between 2001 and 2010 temporarily received the 3.5% COLA in place at the time of their retirements, even though most of those employees began their career before 2001, at a time when the COLA could have been as low as 1.34% (depending on the formula), or even before the COLA was offered at all.

¶ 35 We consider as persuasive several decisions in other jurisdictions applying the contractual analysis we employ in this decision. *See, e.g., Maine Ass'n of Retirees v. Bd. of Trs. of Maine Pub. Emps. Ret. Sys.,* 758 F.3d 23, 31 (1st Cir.2014) (holding the statutory language at best ambiguous and therefore unable to hold that the legislature as a whole unmistakably intended to create contractual rights in a COLA in place at the time that service requirements were satisfied); *Wash. Educ. Ass'n v. Wash. Dep't of Ret. Sys.,* 332 P.3d 439, 444–48 (Wash.2014)

(holding that where amendment or repeal of a COLA is expressly reserved, the legislature may make such changes without violating the contract clause or state constitution); *Bartlett v. Cameron,* 316 P.3d 889, 895 (2013) (holding that the COLA amendments over the years demonstrated a legislative intent to promote current public policy, subject to change, and not a clear and unambiguous legislative intent to protect a vested property right); *but see Hon. Fields v. Elected Officials' Ret. Plan,* 234 Ariz. 214, 320 P.3d 1160, 1165–66 (2014) (holding that the Arizona legislature intended the term "benefit" to include COLA increases and that because the statutory modification diminished and impaired the retired members' benefits, including a vested right in the COLA formula at the time of retirement, it violated the Arizona constitution).

¶ 36 The trial court and the court of appeals assumed that retirees unarguably have a contractual right to their vested PERA base pension retirement benefit, and that issue is not before us. However, the COLA formula in place at a retiree's respective retirement has always been subject to subsequent amendments, thereby permitting the legislature to modify the formula as necessary to ensure the PERA pension funds' long-term stability. We can discern from the legislative history surrounding the COLA amendments that the legislature has never intended to bind itself to paying PERA members the particular COLA formula in place at the time of their eligibility for retirement without change for life. Instead, the General Assembly reserved the ability to respond to variations in the rate of inflation and the financial soundness of the PERA plan. Retirees therefore could not have reasonably expected that the state's provision of any given COLA was a statutory contract protected from change by the Contract Clauses of the U.S. and Colorado Constitutions.

¶ 37 We agree with the district court that neither the language of SB 10–001 itself, nor the legislative history of the COLA amendments, offers any "clear indication"—as required by *National Railroad*—of the legislature's intent to be bound to provide PERA members a fixed COLA for the duration of

their retirement. *See* 470 U.S. at 465–66, 105 S.Ct. 1441. Because there is no such contract, we need not consider the remaining two prongs of the applicable three-part contract clause analysis. Stated otherwise, since we have determined that retirees have no property right in a particular COLA, *see R.I. Laborers' Dist. Council v. Rhode Island,* 145 F.3d 42, 44 n. 1 (1st Cir.1998); *R.I. Bhd. of Corr. Officers v. Rhode Island,* 264 F.Supp.2d 87, 103–04 (D.R.I.2003), their Takings claims and Due Process claims necessarily also fail. *See United States v. Sperry Corp.,* 493 U.S. 52, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989); *Regents of the Univ. of Mich. v. Ewing,* 474 U.S. 214, 227–29, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985).

### Conclusion

¶ 38 The General Assembly's latest modification of the COLA formula is consistent with the PERA legislation's historical base pension benefit and changeable cost of living adjustment structure. Senate Bill 10-001's COLA reformulation did not violate the Contract Clauses of the Colorado or United States Constitutions.

### III.

¶ 39 Accordingly, we reverse the judgment of the court of appeals and uphold the trial court's summary judgment order dismissing this case.

JUSTICE COATS concurs in the judgment.

JUSTICE EID and JUSTICE MÁRQUEZ do not participate.

JUSTICE COATS, concurring in the judgment only.

¶ 40 While I too would reverse the judgment of the court of appeals, I do not join the majority opinion. Although for different reasons, I too would find that the statutes relied on by the plaintiffs do not offer to them a right to contract with the state; however, precisely for that reason, I do not believe either the federal or state constitutional limitation on the impairment of contractual obligations is at issue in this case. Finally, although I object to a number of things about the majority opinion, my fundamental concern is that by merely distinguishing the language and circumstances of these statutory enactments from the pension-related schemes we have previously considered, the majority substantially depreciates the presumption against contracting by legislation and fails to satisfactorily address the real dilemma faced by the lower courts of the jurisdiction—whether they continue to be bound by this court's prior pronouncement that rights accruing under a pension plan are constitutionally protected contractual obligations, and if not, why not.

¶ 41 On their face, the contract clauses of both the federal and state Constitutions, limiting as they do the ability of the state to impair the obligation of contract, definitionally protect only contractual relationships. Although these constitutional provisions protect both private and public contracts, unlike the case with private parties, the power of governments to bind themselves in contract and, even where that power exists, to do so through legislation has long been rigidly circumscribed by judicial interpretation. Contracts purporting to bind governments with regard to the exercise of their core powers, notably their police powers and the power of eminent domain, have long been held void, no matter how deliberately they were entered into. *See United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (tracing history and purpose of reserved powers doctrine); *Wheat Ridge Urban Renewal Auth. v. Cornerstone Grp. XXII, L.L.C.,* 176 P.3d 737 (Colo.2007). Similarly, even with regard to matters appropriately the subject of governmental contract, the intent of a legislative body to contractually bind not only itself but also future legislatures through the enactment of legislation is so at odds with the policy-making nature and obligations of such a body that it can be found to exist only where the language and circumstances of that enactment unmistakably indicate as much. *See, e.g., State of Ind. ex rel. Anderson v. Brand,* 303 U.S. 95, 114, 58 S.Ct. 443, 82 L.Ed. 685 (1938); *see also Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 470, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985).

¶ 42 In finding that the various COLA-type enactments applicable to the individual plaintiffs in this case tendered unilateral contracts to the plaintiffs, which they accepted by becoming eligible for retirement, the court of appeals acknowledged this presumption against contracting by legislation, but rather than feeling obliged to evaluate the specific language and circumstances of these particular enactments, it found that their contractual nature was self-evident from no more than the fact that the rights in question accrued under a pension plan. More particularly, it found that our prior holdings in *Police Pension and Relief Board of the City and County of Denver v. McPhail,* 139 Colo. 330, 338 P.2d 694 (1959), and *Police Pension and Relief Board of City and County of Denver v. Bills,* 148 Colo. 383, 366 P.2d 581 (1961), effectively created a blanket rule, or exception, for rights accruing under a pension plan, regardless of variations in the wording or circumstances of the legislation creating the plan, and that both remain binding precedent for this jurisdiction. Especially in light of our later characterizations of and reliance upon these two cases, this proposition can hardly be ignored or summarily dismissed as lacking support. *See Colo. Springs Fire Fighters Ass'n, Local 5 v. City of Colo. Springs,* 784 P.2d 766, 770 (Colo.1989) (citing *McPhail* for the proposition that "[r]ights which accrue under a pension plan are contractual obligations which are protected under article II, section 11, of the Colorado Constitution and article I, section 10, of the United States Constitution"); *see also Peterson v. Fire & Police Pension Ass'n,* 759 P.2d 720, 723–25 (Colo.1988) (applying the principles of *McPhail* and *Bills* to survivor benefits for a member who was not eligible for retirement before he died).

¶ 43 By distinguishing the cost-of-living-adjustment provisions at issue here on the basis of their failure to include language of entitlement or duration and their numerous subsequent amendments, the majority implicitly rejects this broad reading of *McPhail* and *Bills.* By the same token, however, by *merely* distinguishing these COLA provisions, it fails to directly address the court of appeals' rationale or otherwise account for our post-*McPhail* and *Bills* characterizations

of those cases, as a direct result of which the court of appeals considered itself bound to find a contract. Moreover, by distinguishing these COLA provisions in the manner it does, the majority strongly implies that *McPhail* and *Bills* remain binding precedent with regard to any statutory pension provisions not so distinguishable. Although the majority conclusorily overrules any implication that pension legislation is not subject to the presumption against legislative contracting, nowhere does it offer the slightest explanation for our failure to apply that presumption in our *McPhail* and *Bills* opinions.

¶ 44 Instead the majority offers only the fact that these two cases preceded our holding in *In re Estate of DeWitt,* 54 P.3d 849, 855 (Colo.2002), which explicitly aligned our own Contract Clause with the three-pronged balancing test for assessing a violation of the federal Contract Clause. *DeWitt,* however, did not involve a governmental contract of any kind, much less adopt, address, or purport to alter in any way the presumption against contracting by legislation. Rather, the presumption against legislative contracts, rebuttable only by a showing of "unmistakable" legislative intent to contract, *see Winstar,* 518 U.S. at 873, 116 S.Ct. 2432 (tracing history of unmistakability doctrine from Justice Marshall's opinion in *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 3 L.Ed. 162 (1810)), had been expressly applied in modern federal, pension jurisprudence since at least the New Deal, *see, e.g., Dodge v. Bd. of Educ.,* 302 U.S. 74, 78, 58 S.Ct. 98, 82 L.Ed. 57 (1937); *see also Atchison,* 470 U.S. at 466, 105 S.Ct. 1441, and had been expressly applied in this state long before *DeWitt, see, e.g., Colo. Springs Fire Fighters Ass'n,* 784 P.2d at 773. The law governing statutory contracts in general, and the question whether statutory pension plans establish contractual relationships in particular, was therefore in no way at issue or affected by our opinion in *DeWitt.*

¶ 45 The salient point is that *McPhail* failed to even acknowledge an awareness of, much less actually address, a distinction between the requisites of private and legislatively created contracts. (In fact, its analysis appears to be premised more on equitable principles, in the nature of promissory estop-

pel, than on contract analysis at all.) Whether this court's decision in *McPhail* should be understood, notwithstanding its failure to acknowledge the presumption against legislative contracts, as implicitly finding an unmistakable legislative intent to tender a contract whenever a pension plan is created by legislation; or as carving out a pension plan exception to the presumption under the unique provisions of the state constitution; or perhaps as simply failing, in the absence of a request by the litigants to do so, to treat a popularly ratified and amended city charter as legislative in nature, I believe some explanation why the court of appeals' reading was incorrect and some guidance concerning the continued vitality of these cases is called for.

¶ 46 Whether rightly or wrongly, if *McPhail* simply failed to consider city charter provisions to be legislative in nature, that case would lack any precedential value for the COLA statutes at issue here. With regard to the possibility of an independent state constitutional ground, although *McPhail* references only the Contract Clause of the state constitution, it nevertheless makes no attempt to actually distinguish the state constitution from the federal constitution in this regard. In light of subsequent pronouncements by this court expressly refraining from understanding such a reference to intend a decision on separate state constitutional grounds, *see Price v. City of Lakewood*, 818 P.2d 763, 766 n. 4 (Colo.1991); *People v. Gann*, 724 P.2d 1318, 1320 (Colo. 1986), as well as our express reliance in *Colorado Springs Fire Fighters* on both state and federal constitutions as the basis for our holding concerning the contractual nature of rights accruing under pension plans, I also would reject any interpretation of *McPhail* as finding an exception to the presumption against contracting by legislation in the state constitution. Finally, our *McPhail* opinion offers no suggestion that legislatively granted pension benefits necessarily evidence an intent by the enacting body to bind itself and its successors in contract, and none is readily apparent or offered by either the plaintiffs or the court of appeals. Quite the contrary, the court of appeals made abundantly clear that it considered itself obligated to follow *McPhail* and its progeny, despite expressing

skepticism about their rationales and continued vitality, and it therefore merely remanded for consideration of the public policy aspects of the Contract Clause balancing test.

¶ 47 While I agree with the majority that there are significant differences between the COLA provisions at issue here and the Denver police pension benefit increases at issue in *McPhail* and *Bills*, by simply resting its holding on these distinctions and a legislative willingness to continuously amend the COLA provisions, the majority in my view not only fails to rebut the court of appeals' rationale but actually undercuts the presumption against contracting by legislative bodies as well. While it may be true that the statutes in this case, unlike the city charter in *McPhail*, do not contain language of entitlement or duration, such words are, in any event, not language of contract and would indicate nothing about an intent to contract, even if they had been included. Cf. *U.S. Trust Co. of N.Y. v. N.J.*, 431 U.S. 1, 18, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) (finding language of contract where the statute stated, "The two States covenant and agree with each other and with the holders of any affected bonds...."). At best, words of entitlement and duration merely define the rights intended under a statute unless and until they are changed, but they indicate nothing about a legislature's intent to enter into a binding contract or preclude subsequent amendment. *Dodge*, 302 U.S. at 78, 58 S.Ct. 98 (finding language fixing retirement benefit of school teachers "annually and for life from the date of such retirement" does not evidence legislative intent to create a contractual right). And while the repeated amendment of COLA formulae may serve to emphasize a legislature's awareness of the inherently unpredictable nature of economic conditions from year to year, including changes in the cost of living relative to returns on investments, we have often made clear that the intent of one legislative body most certainly is not dispositive of the intent of a prior legislature. *See Union Pac. R.R. Co. v. Martin*, 209 P.3d 185, 188 (Colo.2009). Such distinctions are unnecessary, however, because under well-accepted standards for assessing whether the presumption against

legislative contracts has been overcome, the Denver City Charter provisions at issue in *McPhail* and *Bills* could no more constitute a contract tendered by the government than could the COLA provisions at issue today.

¶ 48 Legislative action can, of course, create a vested right, in the sense of a right that has attained some independent existence and therefore cannot necessarily be erased by simply abrogating the statute from which it originated, without doing so by contract. In the very series of limitations barring laws impairing the obligation of contracts, the state constitution more broadly bars the general assembly from passing laws that are retrospective in their operation. Colo. Const. art. II, § 11. We have, however, long made clear that even the abrogation of a vested right, while an important consideration, must nevertheless be balanced against public policy considerations similar to those of the Contract Clause balancing test before the abrogating legislation could be struck as retrospective. *In re Estate of DeWitt*, 54 P.3d 849, 855 (Colo.2002); *Ficarra v. Dep't of Regulatory Agencies, Div. of Ins.*, 849 P.2d 6, 21 (Colo.1993). Apparently to avoid any public policy considerations whatsoever, the plaintiffs in this action have limited their claim of a vested right to one originating in contract and contend that our holdings in *McPhail* and *Bills* have created a pension-rights exception from even the Contract Clause balancing test. While I believe that much broader protections against retroactive divestment of vested rights exist in the state constitution, I also believe that statutory contracts, whether or not the statute at issue provides rights accruing under a pension plan, can be judicially recognized to exist only in the face of an unmistakable indication of legislative intent to contract, which I consider to be wholly absent from the COLA statutes at issue in this case.

¶ 49 Because I would therefore reverse the judgment of the court of appeals, but for reasons quite different from those of the majority, I concur only in the judgment of the court.