COLORADO COURT OF APPEALS                                    2016COA141

Court of Appeals Nos. 14CA2195 & 15CA0203
Eagle County District Court No. 12CV409
Honorable Frederick W. Gannett, Judge

DA Mountain Rentals, LLC, a Nebraska limited liability company,

Plaintiff-Appellant and Cross-Appellee,

v.

The Lodge at Lionshead Phase III Condominium Association Inc., a Colorado
not-for-profit corporation, a/k/a the Lodge at Lionshead III Condominium
Association, a Colorado not-for-profit corporation,

Defendant-Appellee and Cross-Appellant.

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE MILLER
Taubman and Fox, JJ., concur

Announced October 6, 2016

Boyle/Apelman PC, Terence P. Boyle, Mark Apelman, Denver, Colorado, for
Plaintiff-Appellant and Cross-Appellee

Nemirow Perez P.C., Miles L. Buckingham, Ronald Nemirow, Lakewood,
Colorado, for Defendant-Appellee and Cross-Appellant

¶ 1    Plaintiff-appellant and cross-appellee, DA Mountain Rentals, LLC (DA), appeals the district court's summary judgment in favor of defendant-appellee and cross-appellant, The Lodge at Lionshead Phase III Condominium Association Inc., a/k/a the Lodge at Lionshead III Condominium Association (Association), and the court's order denying DA's C.R.C.P. 37 motion for attorney fees. The Association cross-appeals the district court's entry of three discovery orders.

¶ 2    This case concerns amendments (2012 Amendments) to the Condominium Declaration for the Lodge at Lionshead III (Declaration) establishing a condominium community (Community) in Vail. The Declaration was recorded many years before the enactment of the Colorado Common Interest Ownership Act (CCIOA), sections 38-33.3-101 through 38-33.3-402, C.R.S. 2016. A supermajority of the members of the Association voted to adopt the 2012 Amendments. The Association claims that CCIOA authorizes their adoption. DA, however, contends that the 2012 Amendments conflict with the express terms of a proviso in the provision of the Declaration governing the procedure for adopting amendments. That proviso specifies that certain rights created by

1

the Declaration — including the allocated ownership interest of each unit — are permanent in nature and may not be altered without the unanimous consent of the owners of units and their first mortgagee lenders (Lenders).

¶ 3     We conclude that (1) CCIOA does not authorize the amendment that would delete that proviso and allow the alteration of such rights without the requisite unanimous consent of members and Lenders; (2) the 2012 Amendments are therefore invalid to the extent they conflict with the proviso; and (3) the 2012 Amendments regarding obsolescence and the creation of a mandatory buyout provision are valid.

¶ 4     In its cross-appeal, the Association challenges the district court's order of the disclosure and production of documents from the file of the attorney who assisted the Association's board of directors in developing and drafting the 2012 Amendments and the court's denial of a related motion for protective order.  The Association contends that the documents in the file were both privileged and irrelevant.  We conclude that the court did not abuse its discretion by entering these orders.

¶ 5     We accordingly affirm in part, reverse in part, and remand to the district court for further proceedings.

## I.     Background

### A.     Adoption of the 2012 Amendments

¶ 6     The Community consists of twelve units.  The Community is governed and operated by the Association in accordance with its governing documents, including, as relevant here, the Declaration.  The owners of the units are members of the Association.  Each member also owns a percentage of undivided interest in the general common elements (GCE) of the Community, which are defined in the Declaration as "the real property hereby submitted to condominium ownership . . . EXCEPT the Units."  The definition provides examples of the GCE, including the foundations, main walls, roofs, halls, lobbies, stairs, yards, gardens, parking areas, and installations of central services such as power, lights, gas, and water.  The Declaration assigns each unit owner a percentage ownership in the GCE.  The members cast votes on Association matters and share expenses in accordance with their respective ownership percentages.  DA owns one of the condominium units and is thereby a member of the Association.

¶ 7     The Declaration was recorded in 1978, and paragraph 18 provides that the "Declaration may be amended by Owners representing sixty percent (60%), or more, of the [GCE] consenting and agreeing to such amendment by written instruments duly recorded."  This language is followed by an important proviso:

> provided, however, that the undivided interests in and to the [GCE] appurtenant to each Unit and the provisions of this Declaration governing the sharing of common expenses shall have a permanent character and shall not be altered without the consent of all of the Unit Owners and their first mortgagees of record[.]

Thus, while this paragraph generally authorizes amendments to the Declaration by a sixty percent vote of member interests, the proviso expressly prohibits any alteration of the undivided interests in the GCE or the sharing of common expenses without the unanimous consent of the members and of their Lenders.  In addition, other provisions of the Declaration require the unanimous approval of the Lenders for renovation or redevelopment and the agreement of unit owners representing eighty percent of the GCE interests for renovation and eighty-five percent for sale of the complex.

4

¶ 8    In 2012, the members voted on the 2012 Amendments, which had been proposed by the Board of Directors (Board) after years of study.  Section 13.1 of the 2012 Amendments would revise the procedure for amending the Declaration, stating in its entirety: "This declaration may be amended by the affirmative vote of the Unit Owners holding at least 67% of the total Association vote." The unanimous member and lender consent requirements of the paragraph 18 proviso would therefore be eliminated.  Other parts of the 2012 Amendments would eliminate lender consent requirements regarding obsolescence (sections 10.1(a) – (b)) and institute a "mandatory buyout" provision (section 10.1(c)) requiring the Association to purchase the units of owners who are not eligible to vote, who do not vote, or who vote against any proposal determining the obsolescence of the condominium complex.

¶ 9    Members constituting approximately seventy-four percent of the GCE interests voted in favor of the 2012 Amendments, thus exceeding the sixty percent requirement of paragraph 18 of the Declaration.  Before the Association recorded the 2012 Amendments with the county, however, DA sought a declaratory judgment in district court that the 2012 Amendments were invalid

because they violated the terms of the Declaration. Because of the lawsuit, the Association has not recorded the 2012 Amendments, and they consequently are not yet effective. *See* § 38-33.3-217(3), C.R.S. 2016.

### B. Disclosures and Discovery

¶ 10 The parties made C.R.C.P. 26(a)(1) disclosures in the district court, but the Association did not disclose documents that it claimed were privileged. DA filed a motion to compel the Association to produce a privilege log of the Association's attorneys' documents, which the court granted in December 2012. The Association complied with the order and produced the log, and DA requested disclosure of communications between the Association's lawyers and the Board and Board committees. The Association asserted that the documents were privileged and not relevant. DA then filed a motion to compel production of all the logged documents, and the Association filed a motion for a protective order. The district court granted DA's motion and denied the Association's motion. Finally, DA filed a motion pursuant to C.R.C.P. 37, requesting costs and attorney fees related to its two

motions to compel and the Association's motion for a protective order. The district court denied this motion.

## C.    C.R.C.P. 56 Motions

¶ 11    Shortly after the court granted DA's second motion to compel and denied the Association's motion for a protective order, the Association filed a motion for determination of law pursuant to C.R.C.P. 56(h) to determine the validity of the 2012 Amendments. The court granted the Association's motion and determined that (1) the 2012 Amendments had been validly adopted and (2) the sixty-seven percent voting requirement they imposed did not violate the terms of the Declaration or CCIOA. The Association next filed a motion for summary judgment under C.R.C.P. 56(b) to resolve the remaining legal issues surrounding the provisions of the 2012 Amendments eliminating the lender approval requirements and providing for mandatory buyouts. The court granted this motion as well.

## D.    The Appeals

¶ 12    DA filed two appeals. In the first, 14CA2195, DA argues that the district court erred by granting the Association's Rule 56 motions. The second appeal, 15CA0203, challenged two post-

judgment district court orders relating to attorney fee and cost awards. The Association moved to dismiss the second appeal because the determination of the attorney fee issue was not completed by the district court and was not a final judgment appropriate for our review. Another division of this court partially granted the motion and (1) dismissed the portion of the appeal that sought review of the district court's order granting the Association's attorney fees as the prevailing party and setting it for a hearing after mandate and (2) denied the motion as to DA's argument that the district court improperly denied its motion for attorney fees as a sanction for alleged discovery violations under Rule 37(a)(4). The division also consolidated the two cases.

¶ 13    On cross-appeal, the Association argues that the court erred by granting DA's motions to compel and denying its motion for a protective order.

¶ 14    We turn first to the question of the validity of the 2012 Amendments.

## II.    Validity of the 2012 Amendments

¶ 15    DA argues that the district court erred when it granted the Association's two Rule 56 motions because (1) the court incorrectly

held that section 38-33.3-217(1)(a)(I) controls over section 38-33.3-120(1)(a), C.R.S. 2016, and imposes a sixty-seven percent cap on amendment requirements; (2) the 2012 Amendments requiring only sixty-seven percent of member votes for amending the Declaration, as construed by the district court, are unconstitutional under the Contract Clauses of the United States and Colorado Constitutions, U.S. Const. art. I, § 10, cl. 1; Colo. Const. art. II, § 11; (3) the amendment eliminating lender approval is invalid as a matter of law; and (4) the mandatory buyout provision is invalid as a matter of law.

## A.     Standard of Review

¶ 16     We review de novo legal questions decided under Rule 56(b) and (h). *Goodman Assocs., LLC v. Winter Quarters, LLC*, 2012 COA 96, ¶ 20 (C.R.C.P. 56(h)); *McIntire v. Trammell Crow, Inc.*, 172 P.3d 977, 979 (Colo. App. 2007) (summary judgment).  Under Rule 56(h), a district court may enter an order deciding a legal question "[i]f there is no genuine issue of any material fact necessary for the determination of the question of law."  Similarly, summary judgment under Rule 56(b) is appropriate where the trial court determines that there is no genuine dispute as to any material fact

9

and that the moving party is entitled to judgment as a matter of law. *Larrieu v. Best Buy Stores, L.P.*, 2013 CO 38, ¶ 6. Where, as here, we must interpret a contract and a statute, we do so de novo. *Oster v. Baack*, 2015 COA 39, ¶ 35 (contract); *McLaughlin v. Oxley*, 2012 COA 114, ¶ 9 (statute). We also review the constitutionality of a statute de novo. *Justus v. State*, 2014 CO 75, ¶ 17.

### B. Validity of the 2012 Amendments Under the Declaration

¶ 17    This dispute concerns the question of the validity, under the terms of the Declaration and CCIOA, of the 2012 Amendments that would eliminate (1) the unanimous member and lender consent requirements for amendments that alter the GCE or the provisions of the Declaration governing the sharing of common expenses and (2) the unanimous lender approval requirements for determining obsolescence.

¶ 18    Before we reach the issue of how CCIOA interacts with the 2012 Amendments, we first examine the terms of the Declaration itself to determine whether they permit the 2012 Amendments.

¶ 19    When interpreting a declaration, we follow the "dictates of plain English" and construe the document as a whole. *Vista Ridge Master Homeowners Ass'n v. Arcadia Holdings at Vista Ridge, LLC*,

2013 COA 26, ¶ 18 (quoting *Buick v. Highland Meadow Estates at Castle Peak Ranch, Inc.*, 21 P.3d 860, 862 (Colo. 2001)). "If a declaration is clear on its face, we will enforce it as written." *Id.*

¶ 20     As we stated, paragraph 18 of the Declaration permits amendment by agreement of unit owners representing sixty percent or more of the GCE,

> *provided*, however, that the undivided interests in and to the [GCE] appurtenant to each Unit and the provisions of this Declaration governing the sharing of common expenses shall have a *permanent* character and shall not be altered without the consent of *all* of the Unit Owners *and* their first mortgagees of record[.]

(Emphasis added.) Under its plain meaning, this provision makes permanent the undivided interests in and to the GCE and the provisions governing the sharing of common expenses, requiring the unanimous consent of members and Lenders to change them.

¶ 21     Under the Declaration, common expenses include "all sums lawfully assessed" against the GCE by the Board and expenditures "for the operation and maintenance of the GCE." And paragraph 19 of the Declaration provides that the members share common expenses in proportion to their respective ownership shares of the GCE as set forth in Exhibit B to the Declaration. The same

percentages are used to determine their voting interests.  Thus, by eliminating the unanimity requirement for members and Lenders, the 2012 Amendments would permit alteration of the undivided interests in the GCE and the sharing of common expenses without one hundred percent member and lender approval.  This could occur if, for example, two-thirds of the members voted to amend Exhibit B and reallocate the percentage ownership interests of some or all of the owners.  Therefore, by the Declaration's own terms, the 2012 Amendments are invalid to the extent that they eliminate the permanent unanimity requirement for member and lender approval mandated by paragraph 18.

¶ 22      The Association stresses that the 2012 Amendments would not on their face affect the GCE.  That is technically true.  But if the 2012 Amendments were allowed to go into effect, two-thirds of the members of the Association would be free to adopt a second set of amendments that could reallocate the GCE percentage interests by simply amending the percentages on Exhibit B to the Declaration or authorizing a redevelopment adding or subtracting the number of units and modifying the GCE percentage interests accordingly.  Such a two-step process would obviously conflict with the clearly

12

expressed intent of the proviso to paragraph 18 that the undivided interests in GCE "have a permanent character" and "shall not be altered without the consent of all of the Unit Owners and their first mortgagees."

¶ 23    Accordingly, the express terms of the Declaration bar any amendments that would authorize alteration of GCE interests or the provisions of the Declaration governing the sharing of common expenses without unanimous consent of all members and Lenders.

¶ 24    We reach a different conclusion with regard to the other 2012 Amendments at issue. The provisions of the Declaration concerning the requirements for the declaration of obsolescence (paragraphs 25(e) and (f)) do not contain similar permanency safeguards. Most notably, unlike paragraph 18, paragraph 25 does not stipulate that the unanimous lender requirements and the eighty and eighty-five percent member approval requirements are "permanent" and immune from alteration. Paragraph 18 carves out only two exceptions to its sixty percent member interest requirement for amending the Declaration, and neither applies to votes for obsolescence (assuming that no related change in the undivided

interests in GCE or in the provisions of the Declaration governing common expenses is made).

¶ 25    Thus, the drafter of the Declaration knew how to immunize a provision from future amendment and did so in the proviso to paragraph 18.  Because the drafter did not include similar language in paragraphs 25(e) and 25(f), those provisions were left subject to the sixty percent amendment process.  *See Hutchinson v. Mullins*, 491 P.2d 71, 74 (Colo. App. 1971) (not published pursuant to C.A.R. 35(f)) (applying the rule of *expressio unius exclusio alterius*, which is routinely applied in the context of statutory interpretation, to contractual interpretation); *cf. Hiner v. Johnson,* 2012 COA 164, ¶ 19.  For this reason, under the plain terms of the Declaration, the obsolescence provisions are subject to the rule requiring only sixty percent member approval to amend.  This requirement was met, and we therefore conclude that the 2012 Amendments eliminating lender approval to declare obsolescence were valid under the original Declaration.

C.    Validity of the 2012 Amendments under CCIOA

¶ 26    Next, we address the interaction between CCIOA and the unanimous member and lender consent requirements for

amendments that alter the GCE.[1]  We conclude that the foregoing construction of the Declaration does not conflict with CCIOA.

¶ 27     Under the basic principles of statutory interpretation, we look first to the plain language of the statute and give words and phrases their ordinary meaning.  *Fischbach v. Holzberlein*, 215 P.3d 407, 409 (Colo. App. 2009); *Stevinson Imps., Inc. v. City & Cty. of Denver*, 143 P.3d 1099, 1103 (Colo. App. 2006).  "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  *Holzberlein*, 215 P.3d at 409 (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).  We do not, however, adopt any interpretation that leads to an absurd conclusion or is at odds with the legislative scheme.  *In re J.N.H.*, 209 P.3d 1221, 1223 (Colo. App. 2009); *Bryant v. Cmty. Choice Credit Union*, 160 P.3d 266, 274 (Colo. App. 2007).

¶ 28     As a general matter, CCIOA does not apply to common interest communities created in Colorado before July 1, 1992.  § 38-33.3-117(3), C.R.S. 2016.  There are two important exceptions.  First,

---

[1] DA has not challenged any of the remaining 2012 Amendments under CCIOA other than the mandatory buyout provision, which we address in Part II.E.

such a pre-existing common interest community may elect to be governed by CCIOA. § 38-33.3-118, C.R.S. 2016. The Association has not made this election for the Community. Second, section 38-33.3-117 contains a list of CCIOA provisions, substantially lengthened over the years, which apply to pre-existing common interest communities. As relevant here, these provisions include section 38-33.3-120 and section 38-33.3-217(1). § 38-33.3-117(1)(f), (1.5)(d).

¶ 29    In support of its argument that, under CCIOA, the 2012 Amendments affecting GCE required unanimous approval of the members and Lenders, DA argues that the matter is controlled by section 38-33.3-120(1)(a), which provides, in pertinent part:

> In the case of amendments to the declaration . . . of any common interest community created within this state before July 1, 1992 . . . [i]f the substantive result accomplished by the amendment was permitted by law in effect prior to July 1, 1992,[2] the amendment may be made either in accordance with that law, in which case that law applies to that amendment, or it may be made under this article[.]

---

[2] Neither party has argued that the substantive result accomplished by the relevant 2012 Amendments was not permitted by law in effect prior to July 1, 1992 (the effective date of CCIOA), apart from the terms of the Declaration itself.

16

Section 38-33.3-120(1) was made retroactive by section 38-33.3-117(1)(f), which provides that section 38-33.3-120(1)(a) applies to all common interest communities created within the state before July 1, 1992, with respect to events and circumstances occurring on or after that date. On its face, then, section 38-33.3-120(1)(a) applies to the Community and the 2012 Amendments.

¶ 30      The Association counters that this issue is controlled by section 38-33.3-217(1)(a)(I), which provides:

> [T]he declaration . . . may be amended only by the affirmative vote or agreement of unit owners of units to which more than fifty percent of the votes in the association are allocated or any larger percentage, not to exceed sixty-seven percent, that the declaration specifies. *Any provision in the declaration that purports to specify a percentage larger than sixty-seven percent is hereby declared void as contrary to public policy*, and until amended, such provision shall be deemed to specify a percentage of sixty-seven percent.

(Emphasis added.) This provision was made retroactive by section 38-33.3-117(1.5)(d), to apply to common interest communities created within the state before July 1, 1992, with respect to events and circumstances occurring on or after January 1, 2006. Again,

on its face, this provision applies to the Community and the 2012 Amendments.

¶ 31    The parties thus agree that the statutes conflict because section 38-33.3-217(1)(a)(I) apparently forbids what section 38-33.3-120(1)(a) and the Declaration permit: a unanimous member and lender consent requirement to alter the GCE.  As the Association correctly points out, in the event of a conflict between CCIOA and the terms of a declaration, CCIOA generally controls.  *See* § 38-33.3-104, C.R.S. 2016 ("Except as expressly provided in [CCIOA], provisions of [CCIOA] may not be varied by agreement, and rights conferred by [CCIOA] may not be waived."); *see also Ryan Ranch Cmty. Ass'n v. Kelley*, 2014 COA 37M, ¶ 31.

¶ 32    However, we conclude that a closer look at section 38-33.3-217(1)(a)(I) reveals that CCIOA expressly permits the unanimity requirement in paragraph 18, thus eliminating any conflict.

¶ 33    Section 38-33.3-217(1)(a)(I) begins by spelling out the exceptions to its application: "[e]xcept as otherwise provided in subparagraphs (II) and (III) of this paragraph (a)[.]"  Relevant here is subparagraph (III)(A), which provides that "[t]his paragraph (a) shall not apply . . . [t]o the extent that its application is limited by

18

subsection (4) of this section." Subsection (4)(a) carves out an exception to the sixty-seven percent cap for amendments changing the allocated interests of a unit, based on the language in a declaration:

> Except to the extent expressly permitted or required by other provisions of this article, *no amendment may* create or increase special declarant rights, increase the number of units, or *change* the boundaries of any unit or *the allocated interests of a unit in the absence of* a vote or agreement of unit owners of units to which *at least sixty-seven percent of the votes in the association,* including sixty-seven percent of the votes allocated to units not owned by a declarant, are allocated *or any larger percentage the declaration specifies.*

(Emphasis added.) Subsection (4)(a) thus expressly recognizes that a declaration may require a vote by unit owners in excess of sixty-seven percent to change the allocated interest of a unit. Although section 38-33.3-217(1)(a)(I) establishes a general sixty-seven percent voting maximum for amending a declaration, it does not apply to changes in the allocated interests of the unit — or, as expressed in paragraph 18, "the undivided interests in and to the [GCE] appurtenant to each unit." More specifically, subsection (4)(a) expressly permits a requirement that an amendment that

alters the GCE must pass with a percentage higher than sixty-seven percent, when specified by the declaration. Thus, CCIOA permits the unanimous member consent requirement for amendments that change the GCE or govern the sharing of common expenses.

¶ 34 Turning to the unanimous lender requirement to these types of amendments, nothing in CCIOA precludes lender approval requirements in this context. To the contrary, section 38-33.3-217(1)(b) provides a notice procedure associations may follow when a declaration requires first mortgagee consent to amendments to declarations. *Cf. Vallagio at Inverness Residential Condo. Ass'n v. Metro. Homes, Inc.*, 2015 COA 65, ¶ 37 (upholding a declarant approval requirement) (*cert. granted* June 20, 2016).

¶ 35 Thus, we determine that (1) section 13.1 of the 2012 Amendments eliminating unanimous member and lender approval for amendments that change the GCE or govern the sharing of common expenses is invalid under the terms of the Declaration and (2) the Declaration's unanimity requirement is valid under CCIOA. We now address the 2012 Amendments' elimination of the lender approval requirements for declarations of obsolescence prior to renovation or sale.

## D. Lender Approval

¶ 36 DA contends that the 2012 Amendments violate the Contract Clauses of the United States and Colorado Constitutions. Because of our rulings in Parts II.B and II.C above, we need only address the elimination of lender approval for declaring obsolescence.

¶ 37 However, DA has not pointed out where this issue was preserved in the district court. Similarly, it has not identified, and we are not aware of, any location in the record where it asserted in the district court that the 2012 Amendments' effect on lender approval was unconstitutional. *See* C.A.R. 28(a)(7)(A). Thus, the issue is not preserved. *See Hassler v. Account Brokers of Larimer Cty., Inc.*, 2012 CO 24, ¶ 35.

¶ 38 Moreover, the discussion of this issue in DA's opening brief addresses primarily the reduction of the one hundred percent owner voting requirements to sixty-seven percent. DA makes a single reference to the elimination of the lender approval requirement, but without explanation. Thus, we need not consider it. *See Barnett v. Elite Props. of Am., Inc.*, 252 P.3d 14, 19 (Colo. App. 2010) (appellate court will not consider a proposition

21

presented without argument or development; an appellant must make specific assertions of error, supported by facts and authority).

¶ 39 DA also argues that elimination of lender approval would place it in default on its deed of trust on its condominium unit. The only factual support for this allegation is an unverified pleading on behalf of DA's apparent Lender. However, we cannot accept unsworn contentions made by a party's lawyer where there is no evidence in the record to support them. *See Mining Equip. Inc. v. Leadville Corp.*, 856 P.2d 81, 86 (Colo. App. 1993) (rejecting a party's contention because the party cited no supporting evidence in the record); *Westrac, Inc. v. Walker Field*, 812 P.2d 714, 718 (Colo. App. 1991) (bare statements in briefs cannot supply that which must appear from a certified record). DA asserts that elimination of the lender approval requirements would violate section 38-33.3-217. As previously discussed, however, section 38-33.3-217 does not address amendments to lender approval requirements in declarations, other than to provide a notification procedure.

¶ 40 Accordingly, we reject DA's challenge based on the alleged effect of the 2012 Amendments on the lender approval requirements

in the Declaration, except as they relate to GCE and the sharing of common expenses.

### E. Mandatory Buyout Provision

¶ 41    Finally, DA argues that the mandatory buyout provision in section 10.1(c) of the 2012 Amendments is invalid as a matter of law because it would violate (1) the Board's fiduciary duties to deal impartially with the Association's members; (2) the Board's fiduciary duty of loyalty to the members;[3] and (3) the implied covenant of good faith and fair dealing.  We disagree.

¶ 42    At the outset, we note that DA has cited no authority that mandatory buyouts are invalid as a matter of law.  To the contrary, Colorado has provided for forced buyouts by statute in certain circumstances.  *See, e.g.,* § 7-64-701, C.R.S. 2016 (forced buyout under Colorado Uniform Partnership Act).  One division of this court has suggested that a forced buyout in a closely held corporation could be a preferable remedy to dissolution.  *Polk v. Hergert Land & Cattle Co.,* 5 P.3d 402, 406 (Colo. App. 2000).  And

---

[3] The parties do not raise the issue whether the Association owes these fiduciary duties to its members.  We therefore do not address that issue.  We assume, without deciding, that DA may assert its breach of fiduciary responsibility claims against the Board, even though it has not named any Board members in its complaint.

23

the Declaration that DA is defending and relying on includes a forced buyout clause.

¶ 43    A fiduciary has a duty to deal with utmost good faith and solely for the benefit of the beneficiary; the fiduciary owes to its beneficiaries, among other duties, the duties of loyalty and to deal with them impartially. *Woodmoor Imp. Ass'n v. Brenner*, 919 P.2d 928, 933 (Colo. App. 1996). DA has not demonstrated that the mandatory buyout provision in this case violates the duties of impartiality or loyalty as a matter of law. The provision applies to all members and does not favor certain members at the expense of any others. It does not permit the Association to compete with the members or otherwise advance its own interests over those of the members. *See* Restatement (Third) of Agency § 8.04 (2006) (duty of loyalty means an agent may not compete with the principal concerning the subject matter of the agency); *see also Smith v. Mehaffy*, 30 P.3d 727, 733 (Colo. App. 2000) ("A breach of the duty of undivided loyalty occurs when [the agent] obtains a personal advantage in dealing with a [beneficiary] or . . . creates circumstances that adversely affect the [beneficiary's] interests.").

¶ 44    The implied duty of good faith and fair dealing "may be relied upon 'when the manner of performance under a specific contract term allows for discretion on the part of either party.'" *New Design Constr. Co. v. Hamon Contractors, Inc.*, 215 P.3d 1172, 1181 (Colo. App. 2008) (quoting *City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006)). "Discretion in performance occurs 'when the parties, at formation, defer a decision regarding performance terms of the contract' leaving one party with the power to set or control the terms of performance after formation." *Id.* (quoting *Parker*, 138 P.3d at 292). "Whether a party acted in good faith is a question of fact which must be determined on a case by case basis." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 499 (Colo. 1995).

¶ 45    We conclude for two reasons that DA has not demonstrated a breach of the implied covenant of good faith and fair dealing. First, there is no discretionary term to which it would apply; the mandatory buyout provision *requires* the Association to purchase a dissenting or abstaining voter's unit at the fair market value of the unit, as determined by an appraisal. The mandatory buyout provision does not give the Association any discretion to determine the terms or conditions of the buyout. Second, because, under the

facts of this case, the Association has not acted on this provision by initiating a mandatory buyout, we cannot speculate whether, in a hypothetical future buyout, the Board might then fail to act in good faith.

¶ 46 Accordingly, DA has not established the invalidity of the mandatory buyout provision.

## F. Summary

¶ 47 In summary, we conclude that section 13.1 of the 2012 Amendments, which provides that the Declaration may be amended by affirmative vote of the owners holding at least sixty-seven percent of the total Association vote, is invalid to the extent it conflicts with the prohibition in paragraph 18 of the Declaration on any alteration in the undivided interests in the GCE appurtenant to each unit and the provisions of the Declaration governing the sharing of common expenses. Those provisions may not be amended without the consent of all the owners and their Lenders in the manner prescribed by paragraph 18.[4] In all other respects, the

---

[4] Because we make these determinations as a matter of law and DA prevails on this issue, we need not address DA's argument that a genuine issue of material fact exists as to whether the 2012 Amendments alter the GCE.

2012 Amendments challenged by DA are valid.  On remand, the district court should issue a decree so stating.

III.    DA's Request for Attorney Fees and Costs

¶ 48    DA contends that the district court erred by denying its request for fees and costs incurred in connection with its efforts to obtain disclosure and discovery of documents the Association claimed are privileged.

¶ 49    We review for an abuse of discretion a district court's decision to grant or deny sanctions, including an award of fees and costs, under C.R.C.P. 37 based on disclosure and discovery deficiencies. *Winkler v. Shaffer*, 2015 COA 63, ¶ 7.  Courts are given wide flexibility in determining whether to impose sanctions.  *Kallas v. Spinozzi*, 2014 COA 164, ¶ 19.  A court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair or based on an erroneous application of the law.  *Vanderpool v. Loftness*, 2012 COA 115, ¶ 19.

¶ 50    C.R.C.P. 37(a)(4)(A) provides that when a motion to compel disclosure or discovery is granted,

> the court *may*, after reasonable notice and an
> opportunity to be heard, if requested, require
> the party or deponent whose conduct

necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the motion, including attorney fees, *unless the court finds that* the motion was filed without the movant's first making a good faith effort to obtain the disclosure or discovery without court action, or that *the opposing party's nondisclosure, response, or objection was substantially justified or that other circumstances make an award of expenses manifestly unjust.*

(Emphasis added.) As is apparent from the plain language of Rule 37, awarding fees and costs is not mandatory. *See Kallas*, ¶ 20; 4 Sheila K. Hyatt & Stephen A. Hess, *Colorado Practice Series, Civil Rules Annotated* § 37 authors' cmt. 37.3 (4th ed. 2005) ("Rule 37(a)(4) provides for an order requiring payment of expenses of the motion to compel after the court determines whether the discovery is improperly sought or withheld. This award is discretionary, and the court has the flexibility to fashion such orders as are just.").

¶ 51    DA argues that the district court erred because (1) it denied DA's motion for attorney fees in a single-sentence order that is devoid of any findings and (2) the Association's failure to produce was not substantially justified. We are not persuaded.

28

¶ 52    Notwithstanding DA's statement that "[t]here is no way to know the trial court's reasoning or analysis," the district court adopted the Association's arguments in its response to DA's C.R.C.P. 37 motion as its reasoning for denying DA's motion for sanctions.  The Association's response sets forth multiple reasons supporting a denial of attorney fees, including that the Association was justified in asserting a privilege on the attorney files that DA sought that were not relevant to the case.

¶ 53    We conclude that the record supports the determination that the Association was substantially justified in objecting to logging and producing the attorney files requested by DA for several reasons:

- The Association argued that the documents sought exceeded the scope of permissible discovery.  The district court recognized the legitimacy of this concern when it granted the motion to compel production of a privilege log: "Whether the Complaint is sufficiently particular to require a disclosure pursuant to C.R.C.P. 26 is a close question."

- None of the orders by the district court and special master granting the motions to compel suggested that the

Association's objections to the motions to compel were filed in other than good faith or otherwise not substantially justified.

- In its order denying the C.R.C.P. 37(a)(4) motion, the court adopted the reasons set forth in the Association's response to the motion. The response provided the bases for the positions it took in opposing the motions to compel. We conclude that the district court did not abuse its discretion in finding that those reasons provided substantial justification for the Association's objections.

- DA argues that the filing of a motion for a protective order was unnecessary and "arguably unauthorized." The Association responds that it filed the protective order to preserve it objections, citing *Scott v. Matlack, Inc.,* 39 P.3d 1160, 1173 (Colo. 2002) ("Once sanctions are sought, the party that failed to file for a protective order has waived its objection to the admissibility of evidence it failed to produce through discovery."). We conclude that the district court did not abuse its discretion in denying attorney fees with respect to the motion on this basis.

30

¶ 54 Accordingly, the district court did not abuse its discretion by denying DA's C.R.C.P. 37(a)(4) motion for fees and costs.

## IV. The Association's Cross-Appeal

¶ 55 On cross-appeal, the Association challenges the district court's rulings requiring the Association to produce privilege logs of certain documents, denying its motion for a protective order for those materials, and granting DA's motions to compel their production. As part of the relief sought by the Association on the cross-appeal, it requests the return of its documents claimed to be privileged. We review the discovery rulings for an abuse of discretion. *Cardenas v. Jerath*, 180 P.3d 415, 421 (Colo. 2008) (privilege log); *Stone v. State Farm Mut. Auto. Ins. Co.*, 185 P.3d 150, 155 (Colo. 2008) (motion to compel); *Liscio v. Pinson*, 83 P.3d 1149, 1156 (Colo. App. 2003) (protective order).

## A. The Privilege Log

¶ 56 We first address the court's December 2012 order requiring the Association to provide a privilege log. After the parties made their initial disclosures, DA filed a motion to compel the Association to turn over the files of the attorney who advised it on matters related to the drafting of the 2012 Amendments. The court ordered

the Association to disclose documents in the attorney's file that are

not privileged and to create a privilege log for those withheld. The

Association did so and now argues that the court abused its

discretion in so ordering because the attorney files were not

relevant to DA's claims.

¶ 57     The Colorado Rules of Civil Procedure govern the scope of

discovery in civil cases. The test for determining whether

information is discoverable is found in C.R.C.P. 26(b)(1). The

version of the rule in effect at all relevant times provided, in

pertinent part:

> parties may obtain discovery regarding any
> matter, not privileged, that is relevant to the
> claim or defense of any party. . . .  Relevant
> information need not be admissible at the trial
> if the discovery appears reasonably calculated
> to lead to the discovery of admissible evidence.

C.R.C.P. 26(b)(1) (2013).[5]  Relevance for purposes of discovery is

different from relevance for admissibility of evidence at trial. Parties

may obtain discovery that relates to a claim or defense of any party

and is "reasonably calculated to lead to the discovery of admissible

---

[5] C.R.C.P. 26(b)(1) was amended in July 2015, effective on July 1, 2015, for cases filed on or after that date, to narrow the scope of discovery and to import the principle of proportionality from former C.R.C.P. 26(b)(2)(F)(iii).

evidence," even if not admissible itself. *Silva v. Basin W., Inc.*, 47 P.3d 1184, 1188 (Colo. 2002) (citation omitted); *see also* C.R.C.P. 26(b)(1).

¶ 58 Under the former version of C.R.C.P. 26(b)(5) (now C.R.C.P. (26)(b)(5)(A)), when a party believes that information subject to disclosure or sought in discovery is privileged, the party may withhold the information, but must "make the claim [of privilege] expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection." *See Alcon v. Spicer*, 113 P.3d 735, 742 (Colo. 2005) ("[W]hen a party wishes to assert privilege in response to a discovery request he or she must notify the party seeking disclosure by providing a privilege log identifying the documents withheld and explaining the privilege claim.").

¶ 59 The Association argues that the district court applied the wrong legal standard to DA's request for the attorney's file and the contents of the file were not relevant because "[t]he key question in this case — whether § [38-33.3-]217(1) automatically reduces the

33

various supermajority requirements in the 1977 Declarations — is strictly a question of statutory interpretation."

## 1. Proportionality

¶ 60　We first address the Association's argument on the proper legal standard. It argues that the court did not make a finding on proportionality required by *DCP Midstream, LP v. Anadarko Petroleum Corp.*, 2013 CO 36. DA counters that the court was not required to do so because it ruled on the scope of discovery before *Anadarko* was decided and the rule in effect at the time did not require a proportionality analysis.

¶ 61　A brief timeline of the pertinent motions and rulings here is helpful in assessing this argument. The district court ruled on DA's motion for disclosure and a privilege log in December 2012, and it appointed the special master to resolve discovery issues in early 2013. As relevant here, the court ordered the Association to produce the attorney's files and make a privilege log for withheld privileged documents because the attorney was an "integral part" of the facts giving rise to the litigation and the court would be faced with similar motions later if it did not address the request. *Anadarko* was decided in June 2013, and the Association filed a

supplemental brief the following month arguing that the court should apply *Anadarko* to the discovery motions before it, thus preserving the argument for appeal. The special master issued an order thereafter in September 2013 finding that the documents were not protected by the attorney-client privilege and compelling production of all the documents listed in the privilege log. The district court adopted the special master's order in October 2013. *See* C.R.C.P. 53(e)(2). Thus, *Anadarko* was decided and brought to the attention of the special master and the court before the orders compelling production of the documents listed in the privilege log were issued.

¶ 62     In *Anadarko*, ¶ 8, the supreme court determined that C.R.C.P. 26(b) "requires trial courts to take an active role managing discovery when a scope objection is raised." When a party raises an objection to the scope of requested information, such as one that the documents requested are not relevant, "the trial court must determine the appropriate scope of discovery in light of the reasonable needs of the case and tailor discovery to those needs." *Id.*

¶ 63    The Association argues that *Anadarko* requires the court to make an express finding on proportionality when determining the proper scope of discovery.  The *Anadarko* court determined that the cost-benefit and proportionality factors in C.R.C.P. 26(b)(2)(F) are "helpful" in determining the scope of discovery and district courts should consider them.  *Id.*  But the court went on to explain that "[w]hen tailoring discovery, the factors relevant to a trial court's decision will vary depending on the circumstances of the case, and trial courts *always possess discretion to consider any or all of the factors listed* — or any other pertinent factors — as the needs of the case require."  *Id.* at ¶ 9 (emphasis added).  The purpose of C.R.C.P. 26(b), the court said, is to require active judicial management of discovery requests when a scope objection is made in order to control excessive requests.  *Id.* at ¶¶ 8, 28.

¶ 64    Cost-benefit and proportionality were factors that courts overseeing discovery considered before the *Anadarko* decision.  *See Averyt v. Wal-Mart Stores, Inc.*, 265 P.3d 456, 461 (Colo. 2011) (explaining that discovery and disclosure are not required for public documents because "[t]he burden imposed upon the parties by such continuing disclosure outweighs any benefit of expediency gained

by automatically sharing the information where, as here, the public information is readily available and equally accessible to both parties"); *In re Attorney D.*, 57 P.3d 395, 399 (Colo. 2002) ("Even though [the Colorado Rules of Civil Procedure] permit broad discovery, it is not unlimited. The discovery process can be abused by disproportionate and inappropriate requests that increase the cost of litigation, harass an opponent, or tend to delay a fair and just determination of the legal issues.") (citation omitted); *Silva*, 47 P.3d at 1188 (same). The *Anadarko* decision does not, then, reflect a significant departure from the previous method of determining the scope of discovery, but rather, highlights cost-benefit and proportionality as important factors that a court should consider when taking an active role to manage discovery and to avoid excessive requests.

¶ 65 The district court here took an active managerial role when the Association objected to the scope of DA's disclosure and discovery requests. When the dispute over the attorney's file developed, the court addressed the issue and the arguments that the Association raised — that the complaint was not sufficiently particular to require disclosure of the file (which is essentially an argument on

relevance), that the Association should not have had to produce a privilege log because DA did not have to produce one, and that the documents were privileged and therefore not relevant — and the court concluded that the files were directly relevant to the case. It narrowly defined the scope of relevant documents as those in the files kept by the attorney and his colleagues pertaining to the single topic of amending the Declaration. Other than stating that the production of a privilege log would require significant time and expense that was disproportionate "when compared to the nonexistent value to the Plaintiff or the case," the Association did not argue with specificity that producing the documents would be unduly burdensome. And the court addressed the aspect of proportionality when it determined that the files were "integral" to the case — thus determining their value was not "nonexistent" to DA.

¶ 66    Further, there is no evidence in the record that the request was disproportionate. DA requested documents in a file on a single topic which were in existence at the time the request was made and which could be identified and reproduced without undue burden. The Association has not provided specifics on either the volume of

production or the costs of gathering, logging, and producing the documents. To the extent that the Association incurred extensive fees and costs in litigating over the privilege issue, such expenses were voluntarily incurred.

## 2. Relevance

¶ 67    Contrary to the Association's second argument about why the court should not have required it to produce a privilege log, the record supports the court's determination that the files were relevant. As discussed above, the applicable test is whether the materials are relevant to the parties' claims and defenses. In its amended complaint, DA made the following allegations, among others:

- "For a number of years now, certain Members of the Association have wanted to redevelop [the community]. Numerous proposals have been discussed and circulated. These proposals . . . all would significantly increase the ownership density of [the community], significantly diminish or eliminate the green space surrounding [the community], and fundamentally alter its character."

- A recent development project proposes to demolish the community and rebuild a thirty or forty unit development with no green space.

- This and other proposals did not garner the requisite eighty-five percent member approval to declare obsolescence, so "the Association, under the guise of 'document modernization,' hired lawyers to re-write the Declaration."

- "The Amendments are an integral and essential part of the over-arching scheme to redevelop [the Community] without following the requirements of the Declaration."

- "Another improper aspect of the [2012 Amendments] is . . . [the] mandatory buyout provision which is essentially a poison pill penalty directed at the Owners who object to redevelopment. . . . This coercive provision goes against the original intent of the Declaration, takes away existing rights and expectations, and is another way of indirectly changing the ownership of GCE without following the Declaration's requirement" of unanimous member and lender approval.

Because of DA's allegations, the records of the attorneys who drafted the contested 2012 Amendments could reasonably have contained information helpful in answering questions about how the 2012 Amendments would affect existing provisions of the Declaration and the Association's governance of the Community. The drafter's intent might have been particularly probative of DA's arguments related to the Association's fiduciary duties.

¶ 68    Thus, the documents were relevant to the claims and defenses of the parties and could reasonably have led to the discovery of other evidence.  The district court, therefore, did not abuse its discretion in determining that the requested documents were relevant and requiring the Association to create a privilege log of the documents it argued were protected by attorney-client privilege.

B. Production of the Attorney's File

¶ 69    The Association next argues that (1) because the documents at issue were subject to the attorney-client privilege, the court abused its discretion in compelling their production in the first instance; and (2) we should reverse the court's order adopting the special master's order denying a protective order and require DA to return the documents.

¶ 70    The attorney-client privilege is codified by statute and operates to protect communications regarding legal advice between attorney and client. *Anadarko*, ¶ 40; *see also Oldham v. Pedrie*, 2015 COA 95, ¶ 46. Colorado has codified the attorney-client privilege as follows: "[a]n attorney shall not be examined without the consent of his client as to any communication made by the client to him or his advice given thereon in the course of professional employment[.]" § 13-90-107(1)(b), C.R.S. 2016. However, "[n]o blanket privilege for all attorney-client communications exists." *Wesp v. Everson*, 33 P.3d 191, 197 (Colo. 2001). This privilege applies only to "confidential matters communicated by or to the client in the course of obtaining counsel, advice, or direction with respect to the client's rights or obligations." *People v. Madera*, 112 P.3d 688, 690 (Colo. 2005) (citation omitted).

¶ 71    The special master found that the attorney-client privilege did not apply to DA's request for the attorney's file for a number of reasons, including that "the privilege does not apply under *Garner* and *Neusteter* because Plaintiff DA alleges that the Association is acting inimically to the interests of its own members." Because we determine that this conclusion is correct, we need not address the

42

special master's remaining conclusions. *See Rush Creek Sols., Inc. v. Ute Mountain Ute Tribe*, 107 P.3d 402, 406 (Colo. App. 2004) (we may affirm a district court's ruling based on any grounds that are supported by the record). The application of the attorney-client privilege is a question of law we review de novo. *See People v. Trammell*, 2014 COA 34, ¶ 9.

¶ 72 The *Garner* and *Neusteter* cases to which the special master referred are *Garner v. Wolfinbarger*, 430 F.2d 1093, 1104 (5th Cir. 1970), and *Neusteter v. District Court*, 675 P.2d 1, 3-4 (Colo. 1984), which address the applicability of privileges to discovery requests in actions brought by shareholders against their corporations. To determine the applicability of these cases to the present case, we first examine their predecessor, *Pattie Lea, Inc. v. District Court*, 161 Colo. 493, 423 P.2d 27 (1967).

¶ 73 In *Pattie Lea*, when a minority shareholder brought an action against the corporation and sought to depose the corporation's accountant, the corporation asserted the accountant-client privilege. *Id.* at 495, 423 P.2d at 28. The supreme court held that the accountant-client privilege "does not protect a corporation from being required to disclose to its own stockholders in a derivative

43

suit brought in good faith against the corporation, communications made by the corporation to its certified public accountant." *Id.* at 498, 423 P.2d at 30. The court explained that a certified public accountant is hired for the benefit of all of the stockholders and the stockholders are therefore entitled to the information the accountant gives the corporation. *Id.*

¶ 74 After this decision in *Pattie Lea*, the Fifth Circuit Court of Appeals addressed nearly the same question about the rights of plaintiff stockholders to discovery in an action alleging the corporation acted against the stockholder's interests. *Garner*, 430 F.2d at 1095-96. But there, the documents the shareholders sought were in possession of the corporation's attorney, and the corporation argued that the documents were protected by the attorney-client privilege. *Id.* at 1096. The Fifth Circuit determined that "where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to *show cause* why it should not be invoked in the particular instance." *Id.* at 1103-04 (emphasis added). In making

this determination, the court acknowledged the Colorado Supreme

Court's "strikingly similar" decision in *Pattie Lea*. *Id.* at 1103. And

it set forth factors that could establish good cause for setting aside

the privilege in favor of the stockholders, such as:

> the number of shareholders and the
> percentage of stock they represent; the bona
> fides of the shareholders; the nature of the
> shareholders' claim and whether it is obviously
> colorable; the apparent necessity or
> desirability of the shareholders having the
> information and the availability of it from other
> sources; whether, if the shareholders' claim is
> of wrongful action by the corporation, it is of
> action criminal, or illegal but not criminal, or
> of doubtful legality; whether the
> communication related to past or to
> prospective actions; whether the
> communication is of advice concerning the
> litigation itself; the extent to which the
> communication is identified versus the extent
> to which the shareholders are blindly fishing;
> the risk of revelation of trade secrets or other
> information in whose confidentiality the
> corporation has an interest for independent
> reasons.

*Id.* at 1104. This has come to be referred to as the "good cause"

test.

¶ 75     Fourteen years later, the Colorado Supreme Court in *Neusteter*

returned to the question whether a privilege applied against

shareholders suing the corporation. 675 P.2d at 4. There, the

corporation asserted the accountant-client privilege when the shareholders sought information provided to the corporation by its accountant. *Id.* The supreme court applied its precedent in *Pattie Lea* and adopted the "good cause" test from *Garner*, deeming the test "an appropriate elaboration and development" of the holding in *Pattie Lea*. *Id.* at 6. On the fact that *Garner* concerned the attorney-client privilege, the court said that this privilege is analogous to the accountant-client privilege. *Id.* at 5. The court then concluded that when the question "whether the corporation was governed properly or inimically to shareholder interests is a central issue of the case, shareholders must be permitted to show that there is good cause not to permit disclosure to be thwarted by invocation of the [accountant-client] privilege." *Id.* at 6. It also adopted verbatim the good cause factors set forth in *Garner*. *Id.* at 6 n.6.

¶ 76        *Neusteter* is similar to the present case in all relevant ways except that it involved the accountant-client privilege rather than the attorney-client privilege. However, *Neusteter* adopted the *Garner* rule that applied to the attorney-client privilege and, in applying it to claims of accountant-client privilege, made clear that,

at least for the purpose of disclosing information to shareholders in a derivative suit against the corporation, the two privileges are analogous. *Id.* at 5. Thus, the *Garner* good cause test applies here, and when shareholders allege that the corporation acted inimically to their interests and seek information from the corporation's attorney, the shareholders may show good cause as to why the attorney-client privilege does not apply. Such a showing of good cause overcomes the privilege.

¶ 77 We note that the United States District Court for the District of Colorado has twice concluded that the supreme court would apply the *Garner* good cause test to determine if shareholders in a suit against the corporation could overcome the attorney-client privilege. *See Galena St. Fund, L.P. v. Wells Fargo Bank, N.A.*, No. 12-cv-00587-BNB-KMT, 2014 WL 943115, at *2 (D. Colo. Mar. 10, 2014) (unpublished opinion); *Ryskamp ex rel. Boulder Growth & Income Fund v. Looney*, No. 10-cv-00842-WJM-KLM, 2011 WL 3861437, at *10 (D. Colo. Sept. 1, 2011) (unpublished opinion).

¶ 78 In the present case, the special master found, and the court adopted his findings and conclusions, that the factors from *Garner* weighed in favor of DA because: (1) it was a longstanding member of

47

the Association; (2) the communications related to past communications and not trial matters; (3) the communications sought were not advice concerning the litigation itself; (4) there was no risk of revealing trade secrets or confidential information; (5) although DA's percentage of the GCE was 7.78 percent, members representing 25.61 percent of the GCE voted against the 2012 Amendments; (6) DA's claims were colorable because they survived a motion to dismiss and alleged the improper elimination of secured lenders; (7) the information sought was necessary and not available from other sources; (8) the full and fair litigation of the issues required the production of the documents; and (9) the information sought was identified and did not require a fishing expedition.

¶ 79    We conclude that the record supports the special master's and court's findings of good cause to waive the privilege and grant DA access to the attorney's file.  Although DA's percentage of GCE is relatively small and it is not joined in the lawsuit by any other members, DA's lawsuit aligns with the interests of the members representing 25.6 percent of the ownership of the GCE who voted against the 2012 Amendments.  In addition, as our discussion in Part II illustrates, DA's claims were colorable and not frivolous.

Further, the requested files were, as the district court found, directly relevant as communications of advice concerning the amendments at issue but did not constitute advice about the litigation itself. As we stated, the communications were specifically identified and could be readily located and produced. Finally, the Association has not identified any information in the attorney file that is confidential for independent reasons. Thus, on balance, the record supports the special master's findings and conclusions, adopted by the court, that DA was entitled to disclosure of the attorney's file.

¶ 80    Accordingly, the district court did not abuse its discretion in ordering the disclosure and production of the documents or denying the request for a protective order.

V.    Attorney Fees and Costs under CCIOA

¶ 81    Both parties seek appellate attorney fees and costs pursuant to section 38-33.3-123, C.R.S. 2016, which governs awards of attorney fees under CCIOA. The statute permits an award of attorney fees and costs to the prevailing party. *See* § 38-33.3-123(1)(c).

¶ 82　　The Association moved for its attorney fees and costs in the district court as the prevailing party, pursuant to section 38-33.3-123(1)(c).  The district court issued an order finding the Association to be the prevailing party.  It concluded, however, that it would be cost effective to defer the hearing on the amount of an award until after this court ruled on the merits of the appeal.  The Association appealed that order in case 15CA0203, and another division of this court dismissed the appeal of that issue as premature.  We therefore do not address the district court's award of fees other than to note that we are reversing the judgment in part.

¶ 83　　Both parties seek their fees incurred on appeal under section 38-33.3-123(1)(c).  Because that issue is intertwined with the award of fees incurred in the district court under the same section, we exercise our discretion under C.A.R. 39.1 and remand to the district court to determine the entitlement to and the amount of any attorney fees incurred on appeal.

## VI.　Conclusion

¶ 84　　The judgment is affirmed in part and reversed in part and remanded to the district court with directions for proceedings

consistent with the conclusions set forth in Parts II and V of this opinion.

JUDGE TAUBMAN and JUDGE FOX concur.